**EXHIBIT C**

**<u>Auction Agreement</u>**

## AUCTION AGREEMENT

This Asset Sale Agreement (**"Agreement"**) is made and entered into as of _____, 2025 (the **"Effective Date"**) by and between HYPERAMS, LLC, an Illinois limited liability company with a principal place of business at 980 Carnegie Street, Rolling Meadows, IL 60008 (the **"Auctioneer"**), and JS Held, LLC, d/b/a Morris Anderson & Associates, Ltd. and Mr. Mark Welch, not personally but solely as the Court appointed Receiver (the **"Receiver"**) of Fourth Street Barbecue, Inc., a Pennsylvania domestic business corporation with a principal place of business at 308 4th Street, Charleroi, PA 15022 (the **"Company"**).

## WITNESSETH:

**WHEREAS**, Company is the owner of the specialty food processing, packaging, support equipment, various inventory, and other personal property located at the Facility[1], which comprise the Company Assets (as defined in the Order, defined below) as of the Effective Date except for those assets described in **Schedule "A"**[2] (hereinafter collectively referred to as the **"Assets"**);

**WHEREAS**, On October 20, 2025, the United States District Court for the Western District of Pennsylvania (the "**Court**") entered an order (the "**Initial Order**") appointing the Receiver, which Initial Order was docketed as Document No. 20 in *The Huntington National Bank v. Fourth Street Barbecue Inc.*, Civil Action No. 2:25-cv-01537 (the "**Action**") which Initial Order was amended on November 3, 2025 by that certain Order Modifying Order Appointing Receiver (the "**Order**") docketed as Document 33 in the Action;

**WHEREAS**, the Order was issued in favor of The Huntington National Bank, as Plaintiff, in its capacity as Administrative Agent and Lender to the Company, thereby appointing the Receiver over the Company and the Company Assets (as defined in the Initial Order) (the "**Receivership**");

**WHEREAS**, the Order identified all property of the Company to be turned over to the Receiver, which includes the Assets;

**WHEREAS,** Receiver desires to retain Auctioneer to provide Sale services with respect to the disposition of the Assets; and

**WHEREAS,** Auctioneer is willing to provide Sale services upon the terms and conditions set forth in this Agreement;

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Receiver and Auctioneer agree as follows:

Section 1.        **DEFINITIONS**

---

[1] Capitalized terms not defined elsewhere have the meaning ascribed to them in Section 1.
[2] Each Schedule attached to this Agreement is incorporated by reference.

Capitalized terms not defined in this Section of the Agreement are defined elsewhere in the Agreement.  For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"**Access**" means the Auctioneer's right to access the Facility for the purpose of conducting and coordinating the Sale, including at times and days outside of normal business hours, but subject to any reasonable rules and conditions of the Receiver.

"**Auction**" means auction sale of the Non-Inventory Assets to be conducted by Auctioneer on behalf of Receiver, together with the work related to preparing for, promoting, setting up, and concluding such auction, with Auction.

"**Conclusion Date**" shall mean the earliest to occur of the (i) date on which the Auctioneer has concluded all Sale activities and the respective purchasers have removed their purchased items from the Facility and the satisfaction of the Parties respective obligations to one another as set forth herein; provided however, the Auctioneer shall have the right to abandon in place any of the Assets as provided in Section 9.8  below; or (ii) the date that is thirty (30) days after the Receiver provides Auctioneer a notice of Conclusion Date which notice may not be sent earlier than four (4) months after the Effective Date; provided that all amounts due and owing to Auctioneer under this Agreement shall be paid on or before the Conclusion Date.

"**Expense Allowance**" means reasonable expenses actually incurred and documented by Auctioneer in preparing for, conducting, and concluding the Sale in the amount of approximately (a) $100,000 for the Auction, and (b) $3,750 per week for an inventory manager utilized during Liquidation, (c) marketing costs for the Liquidation as might be necessary in an amount not to exceed $40,000 and (d) any out of pocket travel costs incurred during the Liquidation unless pre-approved in writing by the Receiver; provided that pre-approval shall not be required if such travel costs are less than $750.

"**Facility**" collectively means the Company's locations at 3 S. Arentzen Blvd, Charleroi, PA and 148 Pennsylvania Avenue, 144, Charleroi, PA.

"**Facility Expenses**" means all occupancy and/or related expenses relating to the maintenance and operation of the Facility, including but not limited to rent, utilities (including electric, water, trash services and dumpsters, and internet), security charges, mortgage payments, complying with applicable lease provision, complying with applicable laws and regulations, including but not limited to environmental laws, phones, internet services, insurance, real estate taxes.

"**Gross Proceeds**" means all revenue from the sale of Assets, excluding any (i) sales taxes, and (ii) Buyer's Premium.

"**Inventory Assets**" means all Assets consisting of inventory.

"**Liquidation**" shall mean the orderly liquidation of the Inventory Assets by the Auctioneer at negotiated prices.

"**Non-Inventory Assets**" means all Assets and Unsold Inventory but shall exclude Inventory Assets.

"**Net Proceeds**" means Gross Proceeds of the Sale minus (a) the Expense Allowance; and (b) the Commission; exclusive of the Buyer's Premium.

"**Sale**" shall mean the combined process of the Liquidation and Auction and shall run from the execution of this Agreement to the Conclusion Date.

"**Sale Order**" means an order of the Court approving this Agreement and the sale of the Assets free and clear of liens, claims, and encumbrances, including holders of claims under the under the Perishable Agricultural Commodities Act of 1930 (as amended, modified or supplemented from time to time, "PACA"), the Packers and Stockyards Act of 1921 (as amended, modified or supplemented from time to time, "PASA") and any state statutes of similar effect (collectively, the "PACA/PASA Claims"), as required by Section 24 of the Order.

"**Unsold Inventory**" means Inventory Assets not sold prior to the Auction.

Section 2.       **RETENTION**

2.1.              Receiver hereby retains Auctioneer, and Auctioneer hereby agrees to serve, as an independent contractor to Receiver in connection with the conduct of the Sale as set forth herein.

2.2.              Auctioneer shall provide Receiver with services (collectively, the "**Services**") with respect to the conduct of the Sale, which Services shall be provided in a commercially reasonable manner. The services will include:

(a)     managing the sale of the Inventory Assets on behalf of the Receiver, including assisting with logistics related to shipment or pickup of the Inventory Assets;

(b)     preparing appropriate marketing materials and disseminating them to market the Sale;

(c)     implement the appropriate pricing and discounting to effectively monetize the Inventory Assets;

(d)     furnishing the necessary labor to conduct the Auction and to otherwise fulfill Auctioneer's obligations under this Agreement;

(e)     lotting, tagging, cataloging and establishing initial/minimum bids, if any, for the Non-Inventory Assets;

(f)     conducting the Sale;

(g)     conducting post-Auction sales of Non-Inventory Assets after the Auction as may be necessary, until the Conclusion Date;

(h)     providing such other related services, deemed necessary or prudent to effectively maximize the proceeds from the Sale including all other services set forth in this Agreement.

4

2.3.          Title to all Assets shall remain with Receiver at all times during the Sale until such Assets are sold and payment in full therefore has been received, at which time Receiver shall pass title free and clear of liens, claims and encumbrances, including those of PACA/PASA Claims, to such buyer of those specific Assets as set forth in the Sale Order.

2.4.          Auctioneer will employ its own websites, social media accounts, and e-mail lists in connection with the marketing for the Sale and may elect to advertise the Sale using third party media.

2.5.          Auctioneer may accept only cash, credit cards, cashier's checks, business checks with approved bank letters of guarantee and wire transfers as payment for the Assets.  All sales of Inventory Assets shall be for cash unless the Receiver agrees to extend credit to the Company's current customers as part of the Sale.  If such credit terms are extended, Auctioneer shall not be responsible for collection and its Commission shall not be dependent thereon.   Unless otherwise agreed, payment for such Inventory Assets must be made on delivery. During the Auction, all Non-Inventory Assets will be sold to the highest bidder subject only to the purchaser's payment in full and removal of the purchased Assets after such payment. If a purchaser fails to so pay then Auctioneer will not permit a purchaser to remove purchased Assets and Auctioneer will use commercially reasonable efforts to resell such Assets.

2.6.          The Assets shall be sold by Auctioneer in their "AS IS" and "WHERE IS" condition, without warranties or guaranties of any sort or nature whatsoever, and Auctioneer, on behalf of Receiver, shall expressly disclaim all representations and warranties of any sort, including warranties as to merchantability or fitness for a particular purpose.

2.7.          Auctioneer is acting solely in the capacity of independent contractor for Receiver and has no knowledge with respect to the fitness or usability of any of the Assets. Auctioneer will not use, alter or repair any of the Assets for any particular purpose or otherwise.

Section 3.    **PROCEEDS**

3.1.          Upon request of Auctioneer, Receiver shall cause the Company to invoice all customers for sales of Inventory Assets during the Liquidation and deposit all cash proceeds into a bank account to be identified by Receiver (the "**Bank Account**").  Receiver shall provide Auctioneer a report of all cash deposited into the Bank Account on a weekly basis. Auctioneer's Commission earned and Expense Allowance during the Liquidation will be invoiced by Auctioneer on a weekly basis and paid by Receiver within seven (7) days of each such invoice.

3.2.          Within 21 days of the conclusion of the Liquidation, Auctioneer shall complete a final reconciliation of the results of the Liquidation and Expense Allowance.  Upon completion of the final reconciliation, Receiver shall remit to Auctioneer any remaining Expense Allowance or Commission, if any or Auctioneer shall remit to the Receiver any overpayment.

3.3.          All proceeds from the Auction, from any source whatsoever, shall be deposited upon receipt by Auctioneer into a segregated account (the **"Proceeds Account"**).

3.4.          Auctioneer shall, within 21 days following Conclusion Date, pay all Net Proceeds from the Auction to Receiver and provide Receiver with a detailed accounting of: (a) Gross Proceeds from sales during the Auction; (b) Auction Expense Allowance; (c) Commission;

(d) Net Proceeds; (e) the sales taxes collected from each purchases of the Assets; and (f) the Buyer's Premium.

Section 4.    **EXPENSES**

4.1.        Auctioneer shall reimburse itself for the Expense Allowance from the Gross Proceeds of the Auction.  In the event that Receiver breaches any of its obligations under this Agreement or terminates this Agreement, Auctioneer shall, in addition to other available remedies, be entitled to recover the Expense Allowance and any Commission or other fees earned prior to such breach or termination.

4.2    With respect to the Liquidation:  (i) Receiver shall be solely liable for, and shall pay when due, all sales taxes, costs, expenses (including the Expense Allowance as set forth in section 3.1 of this Agreement), accounts payable and other liabilities relating to the Sale , the Facilities, Company employees and Company's business operations during the Sale, and (ii) Receiver shall, or shall cause Company to, prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable sales taxes for the Sale to the appropriate taxing authorities.  Auctioneer shall provide Receiver and/or the Company reasonable information and assistance with preparing such tax forms.

4.3    With respect to the Auction, (i) Auctioneer shall collect all applicable taxes required to be charged in connection with the Auction, if any, and shall promptly remit such taxes to the appropriate governmental authority, and (ii) Auctioneer shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes with respect to the sale of the Assets.

Section 5.    **AUCTIONEER'S FEES**

5.1.        Auctioneer shall receive a commission of 5% of the Gross Proceeds of the Liquidation portion of the Sale (the **"Commission"**).

5.2.        Auctioneer may charge and collect from each successful bidder at the Auction an industry standard buyer's premium of 18% (the **"Buyer's Premium"**) for its own account.

5.3.        Receiver shall provide Auctioneer a $50,000 advance upon execution of this Agreement, with such advance to be applied to the final invoices provided by Auctioneer to Receiver as it relates to the Sale, and can be applied to Expense Allowance or the Commission.

Section 6.    **REPRESENTATION & WARRANTIES OF AUCTIONEER**

6.1.        Auctioneer hereby represents, warrants and covenants in favor of the Receiver and the Company as follows:

(a)    Auctioneer has taken all necessary action required to authorize the execution, performance and delivery of this Agreement;

(b)       This Agreement is a valid binding obligation of Auctioneer, enforceable in accordance with its terms;

(c)       No action, arbitration, suit, notice or legal, administrative or other proceeding before any court or government body has been instituted by or against Auctioneer or has been settled or resolved, or to Auctioneer's knowledge, is threatened against Auctioneer or Auctioneer's business or property, that questions the validity of this Agreement or that, if adversely determined, would adversely affect the conduct of the Auction; and

(d)       Auctioneer will conduct its obligations under this Agreement using reasonable best efforts to maximize the Gross Proceeds and minimize the expenses.

6.2.       Auctioneer does not warrant or guaranty in any way the results of the Sale or the potential proceeds to be generated from the Sale.

Section 7.       **REPRESENTATIONS & WARRANTIES OF RECEIVER**

7.1.       Receiver hereby represents, warrants and covenants in favor of Auctioneer as follows:

(a)       Receiver will take all necessary actions required to seek Court authorization and approval of this Agreement and the sale of the Assets pursuant to this Agreement;

(b)       Upon entry of the Sale Order, this Agreement will be a valid and binding obligation of Receiver, enforceable in accordance with its terms;

(c)       No action, arbitration, suit, notice or legal, administrative or other proceeding before any court or government body has been instituted by or against Company or Receiver or has been settled or resolved, or to Receiver's knowledge, is threatened against Company or Receiver or the Company's business or property, that questions the validity of this Agreement or that, if adversely determined, would adversely affect the conduct of the Auction; and

(d)       Upon entry of the Sale Order, Receiver has legal authority to sell the Assets to the general public free and clear of any liens, claims or encumbrances.

Section 8.       **ADDITIONAL DUTIES & COVENANTS OF AUCTIONEER**

8.1.       Auctioneer shall release, indemnify, defend and hold Receiver and its officers, directors, agents and employees, harmless from and against any and all damage, loss, expense, penalty, liability, claim, action, judgments, penalties and fines, court costs and legal or other expenses which Receiver or Company may incur as a direct or indirect consequence in whole or in part of: (a) Auctioneer's performance or failure of performance of this Agreement, (b) Auctioneer's breach of any term or provision of this Agreement, or (c) any negligent act or omission by Auctioneer or its employees or agents.

Section 9. **<u>ADDITIONAL DUTIES & COVENANTS OF RECEIVER</u>**

9.1.    Subject to the provisions and limits of liability under this Agreement, including Section 11.3, Receiver shall release, indemnify, defend and hold Auctioneer and its officers, directors, agents and employees, harmless from and against any and all damage, loss, expense, penalty, liability, claim, action, judgments, penalties and fines, court costs and legal or other expenses which Auctioneer may incur as a direct or indirect consequence in whole or in part of: (a) Receiver's performance or failure of performance of this Agreement, (b) Receiver's breach of any term or provision of this Agreement, (c) any negligent act or omission by Company or its employees or agents, (d) the environmental condition of the real property on which the Facility are located, and/or any asserted damage, if any, to adjacent land owners; (e) any defect or failure not caused by the grossly negligent or intentional misconduct of Auctioneer in product design manufacture, distribution, sale or use by any person or entity of any Assets; (f) liens, claims, interests and encumbrances asserted against the Assets; (g) any failure of Receiver to pay to its employees any wages, salaries, or benefits due to such employees during the Sale or other claims asserted against Auctioneer by Company's employees resulting from Company or Receiver's (and not Auctioneer's) treatment of its employees; or (h) any failure by Receiver to pay any sales taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof.

9.2.    Receiver agrees to take reasonable steps to retain current/former staff from the Company that are knowledgeable of the inventory and equipment and the operation of the Facility to be available to assist the Auctioneer as might be needed during the course of the Sale (the **"Company Personnel"**).   This includes ample sales, IT, accounting, and warehouse employees to assist Auctioneer in conducting the Liquidation as agreed to by the Receiver and Auctioneer.

9.3.    Receiver is responsible and solely liable for all costs related to Company Personnel and Facility Expenses.

9.4.    Receiver grants a limited revocable license to Auctioneer to a) use Company's name, trade names, trademarks, and logos in connection with the Auction, including but not limited to its marketing and in connection with Auctioneer's own marketing materials and efforts, and b) state both in its advertising of the Sale and at the Sale that all Assets are being sold, "AS IS, WHERE IS, AND WITH ALL FAULTS," and otherwise to include any disclaimers of warranty, including but not limited to disclaimers of the warranties of merchantability and fitness for a particular purpose or use. Receiver hereby acknowledges and agrees that Auctioneer has no knowledge with respect to, and has no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Assets.

9.5.    From the Effective Date of this Agreement, Receiver shall refer all inquiries about the Assets to Auctioneer.

9.6.    Receiver agrees that Auctioneer may, in its sole discretion, decline to sell any of the Assets, if, in Auctioneer's opinion, such sale would expose Auctioneer or a purchaser to a claim of liability by any person as a result of such sale.

9.7.    Receiver shall be responsible for any Assets remaining at the Facility on the Conclusion Date, and Auctioneer shall have no obligation to remove any unsold or unclaimed Assets following the Sale.

9.8.          Receiver shall be responsible for any debris, trash, oils, grease, contaminated materials, regulated substances, hazardous materials, and toxic or noxious substances from the Facility that may be found at the Facility, whether or not their point of origin is from the Assets, but excluding any such materials caused by Auctioneer, its agents and contractors and/or purchases of the Assets.  Auctioneer may abandon in place any unsold Assets in a neat and orderly fashion.

9.9.          Receiver shall not offer for sale any of the Assets other than by and through Auctioneer. Receiver may not otherwise dispose of, or withdraw, any Assets from the Sale without consent of Auctioneer.

9.10.          Receiver will, immediately after the Sale, disconnect any utilities that are connected to any of the sold Assets in a reasonable manner designed to protect such Assets and the Facility, at Receiver's sole cost and sole risk.  Purchasers will be solely responsible for rigging and transport sold Assets. Auctioneer will not be responsible for the disconnection or transport of any sold Assets. Auctioneer shall ensure each purchaser of Assets and any contractors they may engage to remove such Assets shall  have general liability insurance with minimum coverage of $1 million per incident and $2 million.

## Section 10.    **INSURANCE**

10.1.          Receiver shall maintain, at its own cost, throughout the Sale adequate casualty insurance on the Assets, general liability insurance as it relates to the operation and maintenance of the Facilities, and workers compensation insurance as it relates to retention of Company's employees, and shall cause Auctioneer to be an additional insured with respect to all such policies. In the event the Assets are damaged by a casualty event covered by such policies, Receiver shall be entitled to retain all such insurance proceeds without liability to Auctioneer hereunder, provided Receiver shall pay Auctioneer the Commission and Buyers Premium with respect to such Assets if/when such insurance proceeds are received.

10.2.          Auctioneer shall maintain, at its own cost, from the Effective Date until the  Conclusion Date comprehensive public general liability insurance policies covering injuries to persons and property in or in connection with Auctioneer's and its agents' and contractors' services hereunder in an amount not less than $1,000,000 per occurrence and $2,000,000 annual aggregate and shall cause Receiver and Company to be an additional insured with respect to all such policies. All such insurance shall be on an "occurrence form" and with a reputable insurance company permitted to do business in the Commonwealth of Pennsylvania, and deliver to Receiver a copy of a certificate of insurance declaration sheet evidencing such coverage prior to the Effective Date.

## Section 11.    **LIMITATION OF LIABILITY AND FORCE MAJEURE**

11.1.     Auctioneer's maximum liability for the breach of any obligation under this Agreement or otherwise in relation to the Auction, and for damages of any type sustained by Receiver or any third party shall be limited to the amounts actually received by Auctioneer for compensation under this Agreement except for (i) any acts by Auctioneer consisting of gross negligence or willful misconduct, as determined pursuant to a final order of a court of competent jurisdiction or (ii) indemnification arising from third-party claims, and only to the extent not otherwise covered by insurance. Receiver also acknowledges that Auctioneer may utilize third party websites and other technology, to the extent the Auction is to be conducted via the internet, and that Auctioneer does not warrant that the use of such technology will be without error or

interruption. Receiver agrees that it will not seek redress from Auctioneer for any such errors or interruptions.

      11.2.   Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of such party including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest, national emergency, revolution, insurrection, epidemic, pandemic, public health emergencies, quarantines, lock-outs, strikes or other labor disputes (whether or not relating to either Party's workforce), restraints or delays affecting the Sale or inability or delay in obtaining supplies of adequate or suitable materials, telecommunication breakdown or power outage, suspension or interruption of regular commercial air traffic, or the inability of either Party's personnel to come to work due to any of the aforementioned (a "***Force Majeure Event***"). The party asserting a Force Majeure Event shall give notice within 5 days of the occurrence of a Force Majeure Event to the other party, stating the period of time the occurrence is expected to continue if such period of time can be reasonably estimated. The party asserting a Force Majeure Event shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The party asserting a Force Majeure Event shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. In the event that a Force Majeure Event remains uncured for a period of 30 days following written notice given by it under this Section 11.2, either party may thereafter terminate this Agreement upon 10 days' written notice to the other party.

      **11.3.**      **Notwithstanding anything to the contrary, nothing in this Agreement shall be binding personally upon Receiver and no deficiency judgment or other action for personal liability shall be brought or maintained against Receiver for breach of this Agreement, it being understood and agreed that any liability of the Receiver under this Agreement shall be expressly limited and exculpated to the Receivership Assets for the satisfaction of Auctioneer's remedies in the event of Receiver's default hereunder. The parties mutually agree that this Section is and shall be considered an integral part of this Agreement.**

      11.4.      The Receiver may terminate this Agreement upon a material breach of this Agreement by Auctioneer.

      Section 12.   **<u>MISCELLANEOUS</u>**

      12.1.      Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by electronic mail or by prepaid registered or certified mail, addressed as follows:

            (i)     in the case of Auctioneer:

               HYPERAMS, LLC
               980 Carnegie
               Rolling Meadows, IL  60008
               Attn:  Robert Pabst

Email: rpabst@hyperams.com

(ii)    in the case of Receiver:

JS Held, LLC, d/b/a Morris Anderson & Associates, Ltd.
Mark Welch as Receiver of
Fourth Street Barbecue, Inc.
1788 Scarlett Drive
Pittsburgh, PA 15241
Email: mark.welch@jsheld.com

With a copy to:

Campbell & Levine, LLC
310 Grant Street, Suite 1700
Pittsburgh, PA 15219
Attn:  Paul J. Cordaro, Esquire and Alexis A. Leventhal, Esquire
Email:  pcordaro@camlev.com and aleventhal@camlev.com

12.2.        This Agreement shall be governed by and interpreted in accordance with the internal laws of the Commonwealth of Pennsylvania, without reference to any conflict of laws or provisions.  Any and all disputes arising from this Agreement and/or the transactions contemplated hereby shall be resolved exclusively by the Court.

12.3.        In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such unenforceable term or provision shall be considered deleted from this Agreement, and the remaining terms contained herein shall continue to be in full force and effect.

12.4.        This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings and can only be modified by a writing signed by Receiver and Auctioneer.

12.5.        This Agreement shall not be assigned by Receiver or Auctioneer without the express written consent of the other party; provided, however, Auctioneer may work with other industry participants in a joint venture capacity and with independent contractors to fulfill its obligations under this Agreement so long as all such parties remain under Auctioneer's supervision and Access.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

12.6.        This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original, and such counterparts, together, shall constitute one and the same instrument.  Delivery by electronic signature or means (such as pdf) of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

12.7.        Nothing contained herein shall be deemed to create any relationship between Auctioneer and Receiver other than that of an independent contractor.  It is stipulated that the parties are not partners or joint venturers.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**HYPERAMS, LLC**

By: _____
Name:  David Fiegel
Title:  Managing Director
PA Auctioneer License Number: AU003422E

**JS HELD, LLC, d/b/a MORRIS ANDERSON & ASSOCIATES, LTD. and MARK WELCH as Receiver of Fourth Street Barbecue, Inc.**

By: _____
Mark Welch, Senior Managing Director