**EXHIBIT C**

**<u>APA</u>**

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of December 19, 2025, is made and entered into by and among **PENNSYLVANIA FOOD CORPORATION**, a Wisconsin Corporation ("Buyer") and **JS HELD, LLC d/b/a MORRIS ANDERSON & ASSOCIATES, LTD. and MARK WELCH**, the court-appointed receiver of Fourth Street Barbecue, Inc. (the "Receiver" or the "Seller").

### BACKGROUND

**WHEREAS**, pursuant to an order of the United States District Court for the Western District of Pennsylvania ("Court") dated October 20, 2025 the Receiver was appointed as receiver over Fourth Street Barbecue, Inc. d/b/a Fourth Street Foods (the "Company") and all of its assets at Case No. 2:25-cv-01537 (the "Receiver Order");

**WHEREAS**, the Company is engaged in the business of food manufacturing, specifically co-manufacturing private label and foodservice channels and related products (the "Business") with operations located in Pennsylvania;

**WHEREAS**, subject to the terms and conditions set forth herein, the Receiver has undertaken to cause Seller to sell to Buyer, and Buyer has agreed to purchase from Seller, substantially all of the assets of the Company (except the Excluded Assets, as defined herein), and Buyer has agreed to assume from Seller only certain specified liabilities and obligations of the Company with respect to the Business (which, for the avoidance of doubt, shall exclude the Retained Liabilities) in each case subject to the terms and conditions as set forth herein; and

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Buyer, Seller and Company hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1.    Certain Definitions. As used herein, the terms below shall have the following meanings. Certain other terms are separately defined within the specific provisions of this Agreement.

"Accounts Receivable" shall mean all money owed to Company for goods or services that it has delivered but has not been paid which, for the avoidance of doubt, shall include each "account," as that term is defined by 13 Pa. Stat. § 9102(a), owed to Company.

"Action" means any action, suit, proceeding, claim, counterclaim, arbitration, charge, complaint, litigation, grievance, mediation, audit, dispute, demand, inspection, inquiry, or investigation.

1

"Affiliate" means, with respect to a particular Person, another Person that directly or indirectly (through one or more intermediaries) controls, is controlled by, or is under common control with, the Person in question.

"Ancillary Agreements" include all other documents reasonably necessary as determined by the Buyer to effectuate the Transactions contemplated herein.

"Assignment and Assumption Agreement" has the meaning set forth in Section 6.3(a)(iii).

"Assumed Contracts and Leases" means those Contracts and Leases set forth on Schedule 1, which may be modified by Buyer between the date hereof and the Closing Date.

"Authorization" means any clearance, Order, authorization, waiver, approval, consent, notification, registration, classification, filing, certificate, license, permit, or franchise issued by any Governmental Authority or other Person including, but not limited to: United States Department of Agriculture (USDA), Food and Drug Administration, and the Department of Agriculture, necessary to operate the Business.

"Budget" means the Company's cash flow forecast and loan projections attached hereto as Schedule 2, which may be modified by mutual agreement of Buyer and Seller between the date hereof and the Closing Date.

"Business" has the meaning set forth in the Background section of this Agreement.

"Business Day" means a day other than Saturday, Sunday, or any day on which banks located in the Commonwealth of Pennsylvania are authorized or obligated to close.

"Buyer" has the meaning set forth in the first paragraph of this Agreement.

"Cash" means all cash and all cash equivalents held by Seller (including marketable securities and short-term investments) related to the Company, as determined in accordance with Income Tax Basis.

"Closing" has the meaning set forth in Section 6.1.

"Closing Date" has the meaning set forth in Section 6.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Fourth Street Barbecue, Inc. d/b/a Fourth Street Foods.

"Company Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA), determined without regard to whether such plans are subject to ERISA, or any other pension, retirement, supplemental retirement, deferred compensation, excess benefit, profit

sharing, bonus, incentive, stock purchase, stock ownership, stock option, stock appreciation right, profits interest, equity derivative or other equity, phantom equity, employment, severance, salary continuation, termination, change-of-control, health, life, disability, group insurance, vacation, holiday or fringe benefit plan, policy, practice, fund, program, agreement, arrangement, understanding or scheme that is at any time sponsored, maintained or contributed to by Seller or any ERISA Affiliate, or with respect to which Company or any ERISA Affiliate otherwise has any Liability, for the benefit of any current or former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of Company or any ERISA Affiliate or the dependents of any of them.

"Contract" means any note, bond, mortgage, indenture, contract, agreement, permit, license, lease, purchase order, sales order, arrangement or other commitment, obligation or understanding, including, in each case, all related exhibits, schedules and other attachments (whether written or oral and whether express or implied), to which a Person is a party or by which a Person or its assets or properties are bound.

"Court" means the United States District Court for the Western District of Pennsylvania, particularly with respect to the action indexed at Case No. 2:25-cv-01537.

"Current Payroll Obligations" means the Company's wage obligations to active employees for ongoing employment between the date hereof and the Closing Date; *provided, however*, the Current Payroll Obligations do not include any wage and benefit obligations related to an employee's termination, including, without limitation, severance, COBRA benefits, or Company Benefit Plan obligations.

"Environmental Law" means any Law or binding Contract with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Substances.

"Equipment" means all equipment set forth in Schedule 3, which may be modified by Buyer between the date hereof and the Closing Date..

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means with respect to Company, any corporation, trade, or business (whether or not incorporated) which is treated with Company as a single employer within the meaning of Section 414 of the Code.

"Governmental Authority" means any and all foreign, federal, state, or local governments, governmental agencies, and governmental entities of any nature whatsoever, and any subdivisions or instrumentalities thereof, including departments, boards (including boards of pharmacy), bureaus, commissions, agencies, courts, tribunals, administrations, and panels.

"Hazardous Substances" means (a) any and all substances, chemicals, wastes, pollutants, contaminants and materials regulated under, or defined or designated as hazardous, dangerous or toxic under any Environmental Law or Healthcare Law; (b) gasoline, diesel fuel or other petroleum hydrocarbons; (c) PCBs, asbestos, mold or urea formaldehyde foam insulation; and (d) natural gas, synthetic gas and any mixtures thereof.

"Income Tax Basis" means United States accounting principles for the preparation of federal income tax returns, as in effect from time to time, consistently applied.

"Indebtedness" means: (i) all indebtedness (including the principal or accreted amount thereof, the amount of accrued and unpaid interest thereon, and all applicable prepayment premiums, penalties or "breakage" costs), whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, (ii) all obligations to pay rent or other payments under a lease of real property or Personal Property that is required to be classified as a capital lease in accordance with Income Tax Basis, (iii) any liability for the deferred purchase price of any property or services, (iv) all obligations under any interest rate, currency or other hedging agreement, (v) any reimbursement obligation that is then due and payable with respect to direct-pay letters of credit, surety bonds, bankers' acceptances or similar facilities, (vi) any obligation of another Person in respect of any of the foregoing that is guaranteed by Company, and (vii) any obligation of another Person in respect of any of the foregoing that is secured by a Lien on any Purchased Asset.

"Intellectual Property" means, collectively, all United States, foreign and international industrial and intellectual property and other proprietary rights, including patents, patent applications, rights to file for patent applications, trademarks, logos, service marks, trade names and service names (in each case whether or not registered) and applications for and the right to file applications for registration thereof, Internet domain names or applications for Internet domain names, Internet and World Wide Web URLs or addresses and web site content, copyrights (whether or not registered), applications for and the right to file applications for registration thereof, licenses, inventions, trade secrets, trade dress, know-how, confidential information, customer lists, supplier lists, proprietary processes and formulae, publicity and privacy rights and any other intellectual property rights arising under the laws of the United States of America, or any state thereof, or any country or province, and all documentation and media (in whatever form) constituting, describing or relating to the foregoing.

"Inventory" means all inventory, including finished goods, supplies, raw food materials, work in process, components, packaging materials, and products, whether located on Company's property or located at any third-party locations, which, for the avoidance of doubt, shall include all "inventory" as that term is defined by 13 Pa. Stat. § 9102(a).

"IRS" means the United States Internal Revenue Service or any successor organization.

"Law" means any law, statute, rule, regulation, code, Order, constitution, treaty, common law, ordinance or published guidance enacted or promulgated by any Governmental Authority.

"Liability" means, with respect to any Person, any liability, obligation or commitment of the Company of any kind, known or unknown, whether absolute or contingent, matured or

4

unmatured, conditional or unconditional, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, or due or to become due whether related to employees, employee benefits, ERISA, COBRA, Insurance, Taxes, environmental matters, or Brokers and which, for the avoidance of doubt, shall include all "claims" as that term is defined by 11 U.S.C. § 101(5).

"Lien" means any lien, encumbrance, claim, charge, security interest, community property interest, equitable interest, option, condition, mortgage, deed of trust, easement, encroachment, right of way, right of first refusal, pledge, conditional sale or other title retention agreement, restriction on use or other restriction and which, for the avoidance of doubt, shall include all "liens" as that term is defined by 11 U.S.C. § 101(37).

"Loss" means any loss, damage, Action, Tax, Liability, deficiency, reasonable amount paid in settlement, penalty, interest, fine, assessment, diminution in value, lost profit, lost revenue, consequential or other damage, fee, cost or expense, including court costs and reasonable attorneys' fees, expenses and disbursements.

"Material Adverse Effect" means any condition, change, event, development, circumstance or effect that has had, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on: (i) the business, assets, condition (financial or otherwise) or results of operations of the Business, (ii) the value of the Purchased Assets, or (iii) the ability of Seller to consummate the Transactions in accordance with the terms hereof.

"Order" means any order, writ, decision, injunction, verdict, ruling, award, decree, or other similar binding determination by or before any Governmental Authority of competent jurisdiction or any arbitrator or mediator with binding authority.

"Ordinary Course of Business" means the ordinary course of business consistent with the past practice (including with respect to quantity and frequency to the extent applicable under the circumstances) of a specified Person.

"PACA" means the Perishable Agricultural Commodities Act.

"Party" means each of Buyer, Seller, and the Company, and referred to collectively as the "Parties."

"Permitted Lien" means a Lien on a Purchased Asset that is listed on Schedule 4, which may be modified by Buyer between the date hereof and the Closing Date.

"Person" means an individual, partnership, limited liability company, corporation, association, business trust, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority, or other entity of whatever nature.

"Personal Property" means all machinery, office and other equipment, furniture, computer hardware, fixtures, motor vehicles, supplies, tools, fixed assets, and other tangible personal property including, but not limited to, all Business-specific items such as presses, furnaces, and tooling.

"Purchase Price" has the meaning set forth in Section 2.4.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Cash" means Cash that is not cash constituting the Purchase Price related to this Transaction and the Remaining Cash.

"Remaining Cash" means Cash in the amount of $500,000.00 that is available for use by Seller and is considered an Excluded Asset.

"Retained Accounts Receivable" means all Accounts Receivable and any causes of action or rights related thereto that are payable to the Company from Tyson Foods, Hillshire Farms, Golden West, and Scott & Jon's. After deducting any expenses incurred by Seller to recover, any cash from these Retained Accounts Receivable, Buyer will be entitled to 90% of the net recovered amount and Seller will be entitled to 10% of the net recovered amount. Seller shall consult with Buyer on strategy in pursuit and settlement of any Retained Accounts Receivable. Seller shall provide Buyer with an itemized listing of all expenses incurred by Seller to recover any of the Retained Accounts Receivable.

"Seller" has the meaning set forth in the opening Recital paragraphs of this Agreement.

"Tax" or "Taxes" means (A) any U.S. federal, state, local, non-U.S. or other taxes or governmental charges of any kind whatsoever, including income, gross receipts, license, payroll, employment, excise, severance, stamp, documentary, occupation, premium, windfall profits, environmental, capital stock, branch, franchise, profits, net profits, net worth, withholding, social security, payroll, unemployment, disability, real property, personal property, escheat, unclaimed property tangible, intangible, commercial activity, sales, use, transfer, registration, value-added, goods and services, alternative or add-on minimum, ad valorem, estimated or other tax of any kind whatsoever, and any similar custom, duty, levy, impost, governmental fee or like assessment, and, including any interest, or penalty in addition thereto, in each case whether disputed or not and (B) any liability in respect of any items described in clause (A) payable by reason of Contract, assumption, transferee or successor liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any similar provision under applicable state, local or non-U.S. law) or otherwise.

"Tax Return" means any U.S. federal, state, local or non-U.S. return, declaration, report, claim for refund, or information return or statement filed or required to be filed relating to Taxes, including any work papers, elections, declarations, schedules, attachment thereto or amendment thereof, an including Treasury Form TD F 90-22.1 and FinCEN Form 114.

"Transactions" means the transactions described in this Agreement and the Ancillary Agreements.

"Transferred Employees" has the meaning set forth in Section 5.5(a).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, as amended, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs, and employment losses.

6

1.2.    Interpretive Provisions. Unless the context otherwise requires: (a) the words "hereof," "herein," and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the terms "Dollars" and "$" mean United States Dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule, Exhibit or Annex shall refer, respectively, to Sections, Subsections, Recitals, Schedules, Exhibits or Annexes of this Agreement; (e) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation"; (f) references herein to any gender shall include each other gender and the neutral, and vice versa; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided*, *however*, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) references herein to any Contract (including this Agreement) mean such Contract as amended, supplemented or modified from time to time in accordance with the terms thereof; (i) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (j) references herein to any Law or any Authorization mean such Law or Authorization as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time; and (k) unless otherwise stated, the term "day" means a calendar day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1.    Agreement to Purchase and Sell. Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) of the Company, wherever located and whether now existing or hereafter acquired, to the extent used, held for use, or in any way related to the conduct of the Business other than the Excluded Assets (collectively, the "Purchased Assets"), in each case free and clear of all security interests, Liens Liabilities, Indebtedness, charges, reservations of ownership, pledges, encumbrances, mortgages, adverse claims, interests or rights of third parties of any nature or kind whatsoever, agreements, royalties, options or privileges (including, without limitation, any conditional sale or title retention agreement, or any capital or financing lease) (other than Permitted Liens or Assumed Liabilities), including without limitation, the following:

(a)    all Purchased Cash;

(b)    all Accounts Receivable and any causes of action or rights related thereto other than the Retained Accounts Receivable;

(c)    all Inventory;

(d)    all prepaid assets;

(e)    all Equipment deposits;

7

(f)     all Equipment;

(g)     all furniture;

(h)     all fixtures;

(i)     all vehicles;

(j)     all spare parts;

(k)     all Personal Property;

(l)     subject to the provision of required notices and receipt of the approvals, consents and waivers referenced in Section 3, the Assumed Contracts and Leases;

(m)     all Intellectual Property;

(n)     all bank accounts related to the Business whether in the name of the Company or the Receiver, all books of account, financial and accounting records, files, invoices, books and records, customer lists, and supplier lists;

(o)     all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights, and all related claims, credits, rights of recovery and set-off in favor of Company;

(p)     all insurance benefits, including rights and proceeds, to the extent relating to any of the Purchased Assets or any of the Assumed Liabilities;

(q)     all credit card merchant identification numbers;

(r)     all intangible assets including, but not limited to, goodwill, customer lists, and the going concern value of the Business; and

(s)     all personal employment records that are legally transferable.

2.2.    Excluded Assets. Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include any of the following assets, properties, and rights of Seller (collectively, the "Excluded Assets"):

(a)     any security deposit not explicitly listed as a Purchased Asset including, without limitation, any deposit with a utility company;

(b)     any stock or ownership interests in the Company;

(c)     Remaining Cash;

(d)     cash constituting the Purchase Price related to this Transaction;

8

(e)     the corporate seals, Organizational Documents, minute books, stock books, Tax Returns and other books or records having to do with the corporate organization of Company.

(f)     all Employee Benefit Plans, any trusts, insurance arrangements or other assets held (existing on or prior to the Effective Date) pursuant to, or set aside to fund obligations under any Employee Benefit Plan, and any data or records related to or required to administer any Employee Benefit Plans;

(g)     all rights to any claims, Actions or causes of Action of any nature related to Company and available to or being pursued by Seller, whether arising by way or counterclaim or otherwise, except for any claims, Actions, or causes of Action of any nature as against any customer or vendor of the Company, whether arising by way of counterclaim or otherwise;

(h)     all claims for refunds or prepayments of Taxes for all periods prior to the Closing; *provided, however*, any refunds or prepayments of Taxes related to the Purchased Assets are considered Purchased Assets;

(i)     the rights which accrue or will accrue to Seller under the Transaction Documents;

(j)     the Retained Accounts Receivable; and

(k)     all assets of Seller unrelated to Company.

2.3.     Assumption of Liabilities.

(a)     Except for the Assumed Liabilities (as defined below), Buyer shall not assume or have any responsibility whatsoever for any other Liabilities of Seller, the Company, the Business or the Purchased Assets (collectively, the "Retained Liabilities"), which Seller shall be and remain responsible for, pay, perform and discharge when due, which Retained Liabilities include, without limitation, the following:

(i)     all obligations, duties or Liabilities of Seller or the Company of any kind or nature, including, without limitation, interest-bearing or capital debts, capital or operating leases, trade accounts payables, related-party obligations, accrued or other tax liabilities of any kind, accrued bonuses, accrued vacation pay, accrued commissions, deferred compensation or related benefits, pension obligations, accruals related to any phantom equity or other equity-type plans, any litigation, claims or demands or legal settlement payable, product or service warranties, environmental liabilities, transaction expenses payable, debts due to shareholders, preferred stocks, seller expenses;

(ii)     any and all Liabilities related to any litigation, Actions, or causes of Action against the Company and Business;

(iii)     obligations or Liabilities under or relating to any plans with respect to the employees or former employees employed by the Company, whether on a full-time or a part-time basis, and whether active or inactive as of the Closing Date to which

Company is a party to or bound by or to which Company has an obligation to contribute relating to any Company Benefit Plan, retirement savings, pensions, bonuses, profit sharing, deferred compensation, share purchase or share option, share appreciation, phantom stock, incentive compensation, life or accident insurance, hospitalization, health, medial or dental treatment or expenses, disability, unemployment insurance benefits, employee loans, vacation pay, severance or termination pay or any other benefit plan including any obligation or liability to make any payment or payments to any person as a result of the transactions contemplated hereby;

(iv)    except for the Current Payroll Obligations, any and all Liabilities for any Transferred Employees, current or former employees, officers, directors, the Receiver, the Chief Restructuring Officer and any other service providers of Seller, the Company or the Business for periods prior to the Closing Date;

(v)    any and all Liabilities under or with respect to employment, termination of employment, compensation or employee benefits of any nature (including, but not limited to, any Liabilities arising out of or related to the WARN Act, any collective bargaining or similar agreement or any Company Benefit Plan, specifically including any Liability of Seller under Code Section 4980B or any similar state Law and any non-funded or under-funded pension plan obligations) for periods prior to the Closing Date, or caused by the Transactions;

(vi)    any and all Liabilities arising under any Law prior to the Closing Date or attributable to the period of time occurring prior to the Closing Date;

(vii)    any and all Indebtedness of Seller or the Company incurred prior to the Closing Date;

(viii)    any and all Liabilities for past due accounts payable arising out of the operation of the Business prior to the Closing Date;

(ix)    any Liabilities of Seller or the Company to any Affiliate of Seller;

(x)    any Liabilities for Taxes (A) of the Company or any of the Company's Affiliates; or (B) imposed on or relating to the Business or any of the Purchased Assets that are attributable to any pre-Closing Date tax period whether or not any such Tax period ends on or before the Closing Date;

(xi)    any Liabilities for overpayments by any customer to Seller or the Company for products sold or services rendered prior to the Closing Date;

(xii)    any Liabilities arising out of the operation of the Business prior to Closing Date relating to any vehicles or cellular phones owned or used by Seller, the Company, or any of Seller's employees or independent contractors;

(xiii)    any tort, contract, regulatory, statutory, or other Liabilities of Seller or Company arising on or before the Closing Date;

(xiv)    any Liabilities related to any Excluded Assets;

(xv)    any Liabilities, claims, obligations, or responsibilities based upon, relating to, or arising from the operation of the Company's Business prior to the Closing Date or for products manufactured or sold, or services performed, by the Company prior to the Closing Date (all such products and services, the "Pre-Closing Products"), including: (A) any express or implied warranty or product liability for the Pre-Closing Products; (B) service, repair, maintenance, or other obligations related to the Pre-Closing Products; or (C) performance obligations under contracts or agreements prior to the Closing Date that are not expressly assumed by Buyer;

(xvi)    all Liabilities relating to or arising from the CARES Act (including any obligation with respect to deferred payroll Taxes), environmental laws, or state or federal labor laws (including, without limitation, the WARN Act);

(xvii)    Any debts, Liabilities, and obligations of the Company or the Seller arising under this Agreement, including, for certainty, all legal, accounting, broker, banking, or other professional fees, costs, and expenses incurred by Company or the Seller in connection with the Receivership, the Company, and the Transactions contemplated herein;

(xviii)    any Liabilities related to the North Plant facility and freezer lease;

(xix)    any Liabilities related to the Nate's Fine Foods recall; and

(xx)    any Liabilities related to claims arising under PACA or similar state laws including, but not limited to, Minnesota and New York.

(b)    Subject to the terms and conditions of this Agreement, Buyer agrees, effective as of the Closing, to assume only the following Liabilities of Seller and no other Liabilities of Seller (collectively, the "Assumed Liabilities"):

(i)    Customer Co-Manufacturing Agreements identified in Schedule 5, which Buyer, in its sole discretion, may modify up to the Closing Date;

(ii)    All unpaid current liabilities of the Company or Seller (related to the Company) accrued on or after the Effective Date and for the benefit of the Purchased Assets up to the amounts provided in the Budget.

(iii)    All liabilities under a capital lease to the extent secured by equipment or other collateral constituting a Purchased Asset.

2.4.    Purchase Price.

(a)    Consideration. The total consideration for the Purchased Assets shall be the assumption of the Assumed Liabilities and the payment of a cash purchase price, in the manner set forth in this Agreement (collectively, the "Purchase Price");

11

(b)    Payment of Purchase Price.  At Closing, Buyer shall pay in cash in the amount of three million and 00/100 dollars ($3,000,000.00) by wire transfer of immediately available funds to the escrow account designated in writing by Seller's legal counsel.

2.5.    Allocation of Purchase Price. Buyer, in its sole discretion, shall determine the allocation of the Purchase Price for book and tax purposes.

2.6.    Removal and Addition of Purchased Assets. Notwithstanding any other provision herein, following execution of this Agreement and prior to the Closing Date, Buyer has the right, on written notice to Seller, to (i) remove Purchased Assets that are listed as of the date of execution of this Agreement (the "Removed Assets"), following which the Removed Assets shall no longer constitute a Purchased Asset, and (ii) add additional assets or properties of the Company or contracts or written agreements (the "Added Assets"), following which the Added Assets shall constitute a Purchased Asset.  Provided, however, that Seller cannot add an asset subject to a purchase money security interest (*i.e.*, an equipment loan or finance lease) without also assuming or paying the associated liabilities.  If Buyer exercises its right with respect to the Removed Assets, the Parties shall promptly execute a written instrument memorializing the Removed Assets, and the Purchase Price shall remain unchanged unless otherwise agreed to in a written instrument signed by the Parties.  If Buyer exercises a right with respect to the Added Assets, the Parties shall promptly execute a written instrument memorializing the Added Assets, and the Purchase Price shall remain unchanged unless otherwise agreed to in a written instrument signed by the Parties.

2.7.    Funding of the Company's Business.  On the Tuesday of each week between the date hereof and the Closing Date, Seller will provide Buyer with an itemized list of expenses to be paid the following week (the "Weekly Cash Forecast") necessary to operate the Business.  For the avoidance of doubt, the Weekly Cash Forecast is solely and exclusively for expenses necessary to maintain the Company's Business and the Weekly Cash Forecast is subject to modification based on Buyer's review and modifications, which are in Buyer's sole discretion. On the Friday following the delivery of the Weekly Cash Forecast, the Buyer will either (a) authorize Seller to utilize the Purchased Cash or (b) provide Seller with Cash (each, a "Cash Draw") to pay agreed-upon expenses for Business operations set forth in the Weekly Cash Forecast; *provided, however*, Seller will not be required to utilize the Remaining Cash to fund ongoing operations.  The utilization of the Purchased Cash will not adjust or modify the Purchase Price.  For the avoidance of doubt, Seller will fund the Weekly Cash Forecast **in advance**, as may be modified as provided herein.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER AND THE COMPANY

Except as set forth on the disclosure schedules delivered by Seller to Buyer in connection with this Agreement ("Schedules" and each a "Schedule"), Seller hereby represents and warrants to Buyer that the statements contained in this Article III are true, correct and complete as of the Closing Date:

3.1.    Organization; Good Standing. Receiver is duly appointed pursuant to the Receiver Order, and subject to additional orders of Court authorizing the sale and transaction

contemplated herein and has all requisite power and authority and has taken all action necessary to authorize the execution and delivery of this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Receiver and constitutes the valid and binding obligation of Receiver, and subject to entry of a sale order, enforceable against Receiver in accordance with its terms. There exists no option, warrant, call, commitment, subscription or right of any nature (whether vested or not) for any equity ownership of the Company accruing for the benefits of any other Person.

3.2.    Authorization; Binding Effect. Upon approval by the Court, this Agreement and each of the other agreements to be executed and delivered pursuant to this Agreement (the "Ancillary Agreements") to which Seller is a party, have been duly authorized by all requisite action on the part of Seller and constitute the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, except as such enforceability may be limited by any applicable bankruptcy, reorganization, insolvency or other laws affecting creditor's rights generally or by general principles of equity. Upon approval by the Court, Seller has full power and authority to enter into this Agreement and the Ancillary Agreements to which such Person is a party, to carry out its and his obligations hereunder and thereunder and to consummate the Transactions. Receiver is entering into this Agreement solely in his capacity as Receiver under the Receiver Order and to the extent this Agreement indicates that Receiver has obligations related to his performance hereunder.

3.3.    Non-Contravention; Governmental Authorizations and Filings. The execution and delivery by Seller of this Agreement and each of the Ancillary Agreements to which Seller is a party, and Seller's compliance with the terms and conditions of this Agreement and each of the Ancillary Agreements, and the consummation of the Transactions, do not: (i) require the Authorization from, with or to, any Person (including without limitation, any Regulatory Filing required to be made to any Governmental Authority); (ii) violate any provision of, or require any Authorization under, any Law or Order applicable to Seller, the Business or the Purchased Assets; (iii) violate, conflict with, result in a breach of or a default under (whether with or without notice or the lapse of time), accelerate or permit the acceleration of the performance under, or require any Authorization under, any Contract or Authorization to which Seller is a party or by which Seller is bound or to which any of their respective assets or properties, including the Purchased Assets, are subject; or (iv) result in the creation of any Lien on any Purchased Assets.

3.4.    Employees. The Seller, as Receiver for the Company, or the Company is not, and has not been, a party to, subject to or bound by any pension agreement or collective bargaining or other similar agreement; (a) no union, works council or labor organization currently represents or has ever represented, or to the knowledge of Seller, purports to represent or has purported to represent any employee of Seller or the Company; (b) no current directors, officers or employees of Seller, as Receiver for the Company, or the Company are a party to any employment or severance agreement; (c) neither Seller, as Receiver for the Company, the Company nor any Affiliate of the Company is a party to any "change-in-control," retention or other similar Contract that requires the payment of any amount to any Person as a result of the Transactions; (d) no union has been certified or recognized as the collective bargaining representative of any of such employees or has attempted to engage in negotiations with Seller, as Receiver for the

13

Company, or the Company regarding terms and conditions of employment; (e) no unfair labor practice charge, lockout, work stoppage, or picketing has occurred or is pending; (f) no executive or key employee or any group of employees has any plans to terminate his or her employment as a result of the Transactions; and (g) no employee is subject to any non-compete, nondisclosure, confidentiality, employment or consulting agreements that adversely affects or is in conflict with the present or contemplated business activities of Seller, as Receiver for the Company, or the Company.

3.5 <u>Environmental Matters</u>. The Seller represents and warrants that, to the best of its knowledge after reasonable inquiry, the Company is in compliance with all applicable environmental laws and regulations. The Seller further represents and warrants that, to the best of its knowledge after reasonable inquiry, there are no hazardous materials located on any of the real property utilized by the Company or in the Company's possession or control and that there are no known or threatened environmental claims, violations, or liabilities associated with the Company or arising from or related to the operation of the Business.

3.6 <u>PACA Claims</u>. The Seller represents and warrants that a true and correct schedule of all known or threatened claims known or expected by Seller arising under PACA or similar state laws including, but not limited to, Minnesota and New York, which was provided to Buyer prior to execution of this Agreement.

3.7 <u>Brokers</u>. Seller, Company, or any Person acting on Seller's or Company's behalf has become obligated to pay any fee or commission to any broker, finder, or intermediary for, or on account of, the Transactions. If Seller, Company, or any Person acting on Seller's or Company's behalf shall be the sole obligation of the Seller and, for the avoidance of doubt, Buyer assumes no obligation with respect to such fees or commission.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the statements contained in this <u>Article IV</u> are true, correct, and complete as of the date hereof and as of the Closing Date:

4.1    <u>Organization</u>. Buyer is a duly formed corporation in Wisconsin, validly existing and in good standing under the laws of the State of Wisconsin.

4.2    <u>Authorization; Binding Effect</u>. This Agreement and the Ancillary Agreements to which Buyer is a party have been duly authorized by all requisite corporate action on the part of Buyer and constitute the legal, valid, and binding obligation of Buyer enforceable in accordance with their respective terms. Buyer has all requisite power and authority to enter into this Agreement and the Ancillary Agreements to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions.

4.3    <u>Non-Contravention; Governmental Authorizations and Filings</u>. The execution and delivery by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer is a party, and Buyer's compliance with the terms and conditions of this Agreement and each of the Ancillary Agreements, and the consummation of the Transactions, do not (a) conflict with, or require the consent of any Person that has not been obtained under Buyer's organizational

14

documents, or (b) violate any provision of, or require any Authorization under any applicable Law or Order. No Authorization from, with or to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreements to which Buyer is a party or the consummation of the Transactions.

4.4    Brokers. Neither Buyer nor any Person acting on Buyer's behalf has become obligated to pay any fee or commission to any broker, finder, or intermediary for, or on account of, the Transactions.

## ARTICLE V
## COVENANTS

5.1    Confidential Information

(a)    Seller and Buyer acknowledge that the Confidential Information (as hereinafter defined) constitutes a valuable, special, and unique asset of Buyer and its Affiliates as to which Buyer and its Affiliates have the right to retain, and do retain, all of their proprietary interests. Seller agrees that, from the date of this Agreement and through and after the Closing Date, Seller shall not, without Buyer's prior written consent, disclose any of the Confidential Information to any Person for any reason or purpose whatsoever or make use of any of the Confidential Information for its or his own purposes or those of another. Seller further agrees to deliver to Buyer, upon Buyer's request, copies of all Confidential Information that such person or entity may then possess or have under its or his control, provided, however, that all Confidential Information consisting of computer files or original documents shall be delivered to Buyer. As used herein, "Confidential Information" shall consist of all information, knowledge or data relating to the Business (including without limit all information relating to customer and prospective customer lists, customer pricing, volume or margin information, and trade practices) which is not in the public domain or otherwise published or publicly available. "Confidential Information" (and the related covenants pursuant to the terms of this Agreement) shall not apply to information that is now or hereinafter becomes part of the public domain other than by reason of a breach by Seller of this Agreement.

(b)    If Seller is compelled to disclose any information described in the immediately preceding sentence by judicial or administrative process or by other Law or Order, such Person shall promptly notify Buyer in writing and shall disclose only that portion of such information which such Person is advised by its counsel in writing that is legally required to be disclosed.

(c)    Buyer Remedies.

(i)    The Parties hereto mutually recognize that the covenants set forth in this Agreement are reasonable and necessary for the protection of Buyer's business interests and that irreparable damage will result to Buyer in the event of the breach or threatened breach by Seller or the Company of any of the covenants and assurances contained herein with no adequate remedy at law. If Seller violates the provisions hereof, Buyer shall be entitled to enjoin and restrain such party and each and every Person

concerned therewith, from the continuance of such violation of the terms hereof and to recover Losses sustained by Buyer by reason of such violation and other equitable relief.

(ii)    The Parties further covenant and agree that if Seller violates any of its or their covenants and agreements contained herein, Buyer shall also have the right to receive all Losses and other damages and remedies to which Buyer may be entitled at law or in equity. Such remedies shall be in addition to and not in limitation of any injunctive relief or any other rights or remedies to which Buyer is or may be entitled at law or in equity or under this Section.

5.2.    [Reserved].

5.3.    <u>Tax Matters</u>.

(a)    <u>Assistance and Records</u>. Buyer and Seller shall provide each other with such assistance as each may reasonably request in connection with (i) the preparation of Tax Returns required to be filed with respect to either such Party or to the owners of the Company, (ii) any audit or other examination by any Governmental Authority, (iii) any judicial or administrative proceedings relating to liability for Taxes, or (iv) any claim for refund in respect of such Taxes.  Such assistance shall not require any cooperating Party to incur any expenses but shall include making employees reasonably available to the other Party and their counsel, providing additional information, and furnishing to, or permitting the copying by, either Party or its counsel of any records, returns, schedules, documents, work papers or other relevant materials that might reasonably be expected to be used in connection with any such return, audit, examination, proceeding or claim.

5.4.    <u>Bulk Sales Laws</u>. The Parties hereby waive compliance with all bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer, it being understood that any Liabilities arising out of the failure by any of the Parties to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction shall be Retained Liabilities and the Buyer shall be released from any and all liability related thereto.. Promptly after Closing, Seller shall apply for and provide to Buyer tax clearance certificates from the Pennsylvania Departments of Revenue and Labor & Industry showing no outstanding obligations as of the Closing Date.

5.5.    <u>Employees</u>.

(a)    Buyer may, but shall not be obligated to, offer, or cause its Affiliates to offer employment to any active employee of the Business immediately prior to the Closing Date, with such employment to be on such terms as are offered by Buyer in its sole discretion and to be effective immediately following the Closing.  Seller shall use commercially reasonable efforts to assist Buyer in its efforts to employ each such employee. Seller shall timely terminate the employment of each such employee effective immediately following the Closing. Each such employee that accepts an offer of employment from Buyer is referred to herein as a "<u>Transferred Employee</u>." For the avoidance of doubt, Seller remains solely liable for all Liabilities (including statutory or contractual severance benefits) relating to each employee of the Business (including

any Transferred Employees) which arise or are incurred or occurred prior to the Closing Date other than to the extent assumed as an Assumed Liability related to unpaid current liabilities.

(b)     Seller, as Receiver for Company, shall remain solely liable for any Liabilities relating to any Transferred Employee (or any dependent or beneficiary of any Transferred Employee) which arise as a result of an event or events that occurred prior to the Closing Date, except to the extent included as an Assumed Liability related to unpaid current liabilities.

(c)     Seller shall be solely responsible for compliance with the requirements of Section 4980B of the Code and Part 6 of Subtitle I of ERISA, including provision of continuation coverage (within the meaning of COBRA), with respect to all employees of the Business, and their respective eligible spouses and dependents, for whom a qualifying event (within the meaning of COBRA) occurs at any time prior to the Closing Date (including qualifying events that occur in connection with the transactions contemplated by this Agreement). Seller and Buyer hereby agree to follow the standard procedure for employment tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, the Seller shall have employment tax reporting responsibilities for the wages and other compensation it pays to Transferred Employees and Buyer shall have employment tax reporting responsibilities for the wages and other compensation it pays to Transferred Employees.

(d)     Notwithstanding anything in this Article V to the contrary, nothing contained herein, whether express or implied, shall be treated as an establishment, amendment or other modification of any Seller or Company Benefit Plan or any employee benefit plan of Buyer or any of its Affiliates, or shall limit the right of Buyer or any of its Affiliates to amend, terminate or otherwise modify any employee benefit plan from and after the Closing Date.

(e)     The Company shall bear any and all obligations and Liability under the WARN Act resulting from employment losses, whether pursuant to this Article V or otherwise.

(f)     Buyer shall be liable for all liabilities, if any, related to Transferred Employees solely to the extent arising after the Closing.

5.6.    <u>Discontinuation of Name Use</u>. From and after the Closing, Seller shall not use in commerce the name Fourth Street Barbecue, Inc. d/b/a Fourth Street Foods.

5.7.    <u>Further Assurances</u>. From the date hereof and following the Closing, the Parties shall execute and deliver such additional documents, conveyances, and assurances, and take such further actions reasonably required to carry out the provisions hereof.

5.8.    <u>No Successor Liability</u>. The Parties intend that, to the fullest extent permitted by applicable Law, upon the Closing, Buyer shall not be deemed to: (a) be the successor of the Company; (b) have, de facto, or otherwise, merged with or into the Company; (c) be a mere continuation or substantial continuation of the Company or the enterprise(s) of the Company; or (d) be liable or have any Liability for any acts or omissions of the Company in the conduct of its Business or arising under or related to the Purchased Assets other than the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall have no obligations for any Liens, Liabilities,

17

Indebtedness, encumbrances (other than the Assumed Liabilities and Permitted Liens ) against the Company or any of the Company's predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of the Company, the Purchased Assets or any Liability or Indebtedness of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the order of the Court approving this Agreement shall contain provisions substantially in the form set forth in this Section 5.8, with such language being a material inducement to Buyer's agreement to consummate the Transactions.

### ARTICLE VI
### CLOSING

6.1.    <u>Closing</u>. The closing of the Transactions (the "<u>Closing</u>") shall take place: (a) electronically or (b) at such place and time and in such manner as is mutually agreeable to Buyer and Seller except that Closing must occur on or before January 26, 2026 (the "<u>Closing Date</u>"). or as otherwise extended by Buyer in its sole discretion provided that there is sufficient availability under the Budget to fund operations through such extended closing date (the "<u>Extended Closing Date</u>") The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date.

6.2.    <u>Breakup Fee</u>. In consideration for the considerable time, effort and out of pocket expenses undertaken by Buyer in connection with negotiating the terms of this Agreement and in connection with the transactions contemplated by this Agreement, in the event that the (x) Seller enters into an alternative transaction with respect to a Party other than the Buyer or (y) Buyer terminates this Agreement on account of a breach by Seller, Seller shall immediately pay to the Buyer the sum of $300,000.00 (the "<u>Breakup Fee</u>"). The Parties agree that Breakup Fee is fair and reasonable in the event of Seller's failure to close the sale to the Buyer, the difficulties of proof of loss and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

6.3.    <u>Closing Deliveries</u>.

(a)    At the Closing, Seller shall deliver, or cause to be delivered, to Buyer (or Buyer shall have otherwise received) the following items, each in the form attached to this Agreement as an Exhibit or in form and substance acceptable to Buyer, in its sole discretion:

(i)    A final non-appealable order of Court approving the Transactions free and clear of all Liens, Liabilities, Indebtedness, and encumbrances except as provided in this Agreement including a finding by the Court that the Buyer is not a successor to the Company or the Receiver in any way respect whatsoever ("<u>Sale Order</u>"). The Buyer reserves the right to waive, in its sole discretion the requirement that any Sale Order approving this Transaction be a final, non-appealable order.

(ii)    a bill of sale (the "<u>Bill of Sale</u>") duly executed by Seller, transferring the Purchased Assets to Buyer;

18

(iii)    an assignment and assumption agreement, if any, (the "Assignment and Assumption Agreement"), duly executed by Seller, transferring the Assumed Contracts and Leases, and Assumed Liabilities to Buyer;

(iv)    any and all Authorizations including but not limited to (to be added); and

(v)    such other customary instruments of transfer, assumption, filings, or documents as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following items, each in the form attached to this Agreement as an Exhibit or in form and substance reasonably acceptable to Seller:

(i)    the Assignment and Assumption Agreement, if any, duly executed by Buyer; and

(ii)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

## ARTICLE VII
## COVENANTS OF SELLER PRIOR TO CLOSING DATE

7.1.    Access and Due Diligence Investigation. Between the date of this Agreement and the Closing Date, Seller will, and will cause each of its representatives to, (a) afford Buyer and its representatives and prospective lenders and their representatives (collectively, "Buyer's Advisors") full and free access, upon reasonable advance notice to Seller and at reasonable hours, to the Company's properties, contracts, books and records, other documents and data, key employees, customers, suppliers, and advisors, (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request for purposes of conducting its due diligence investigation of the Company and the Business.

7.2.    Operations of the Business of the Acquired Companies. Between the date of this Agreement and the Closing Date, Seller will:

(a)    segregate the Remaining Cash

(b)    conduct the Business only in the Ordinary Course of Business and in accordance with the agreed-upon Weekly Cash Forecasts, utilization of the Purchased Cash, and Cash Draws; and

(c)    use its best efforts to preserve the current business organization of Seller, keep available the services of the current employees, except for any family member of the Seller and agents of Seller, and maintain the current relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with Seller.

7.3.    Required Authorizations. As promptly as practicable after the date of this Agreement, Buyer and Seller will make all filings required by Law to be made by them in order to secure all Authorizations necessary to consummate the Transactions. Between the date of this Agreement and the Closing Date, Seller will cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Law to make in connection with the Transactions.

7.4.    Notification. Between the date of this Agreement and the Closing Date, Seller will promptly notify Buyer in writing if Seller becomes aware of any fact or condition that causes or constitutes a Breach of any of Seller's representations and warranties as of the date of this Agreement, or if such Seller becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition.

7.5.    No Negotiation. Seller shall not, and will not cause any of its Representatives to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the Business or the Purchased Assets, or any of the Shares, or any merger, consolidation, business combination, or similar transaction involving the Seller, the Company or the Business and shall immediately terminate and cease any ongoing negotiations, solicitations or discussions related thereto.  Nothing herein shall prohibit or otherwise prevent Seller from complying or otherwise taking any action that is necessary to do so in order to comply with its fiduciary duties.

7.6.    Milestones. Seller shall:

(a)    not later than December 31, 2025, Seller shall file with the Court a motion acceptable to the Buyer seeking approval of this Agreement.

(b)    Not later than January 23, 2026, obtain entry of an order acceptable to the Buyer approving this Agreement.

(c)    take all actions necessary or requested by Buyer to cause the Closing to occur not later than January 26, 2026.

## ARTICLE VIII
## COVENANTS OF BUYER PRIOR TO CLOSING DATE

8.1.    [Reserved]

## ARTICLE IX
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Business and the Purchased Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

20

9.1.    Order. The Court shall have entered the Sale Order in a form acceptable to the Buyer in its sole discretion approving the Transaction and the transfer of the Purchased Assets free and clear of all Liens, Liabilities, Indebtedness and encumbrances other than the Permitted Liens and Assumed Liabilities.

9.2.    Schedules. Seller shall have provided all required Schedules to this Agreement, with any additional or modified Schedules provided by Seller, in a form acceptable to Buyer in its sole discretion.

9.3.    Accuracy of Representations. All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

9.4.    Due Diligence. Buyer shall have completed its due diligence investigation and been reasonably satisfied with the outcome and results of such investigation.

9.5.    Seller's Performance.

(a)    All of the covenants and obligations that Seller are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)    Each document required to be delivered pursuant to this Agreement must have been delivered, and each of the other covenants and obligations in this Agreement must have been performed and complied with in all respects.

9.6.    Authorizations. All Authorizations must have been obtained and must be in full force and effect.

9.7.    No Proceedings. Since the date of this Agreement, there must not have been commenced or threatened against Buyer, or against any Person affiliated with Buyer, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Transactions.

9.8.    No Claim Regarding Shares or Sale Proceeds. There must not have been made or threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of the Shares, or any other voting, equity, or ownership interest in, the Seller, or (b) is entitled to all or any portion of the Purchase Price except by creditors of Company whereby liens or rights are transferred from the Purchase Assets to the Purchase Price.

9.9.    No Prohibition. Neither the consummation nor the performance of any of the Buyer's obligations under this Agreement will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or

cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Law, or (b) any Law that has been published, introduced, or otherwise proposed by or before any Governmental Body.

9.10.   No Succession, Pension, Union Contract, and Environmental Issues. Buyer, with respect to its operation of the Business post-Closing or otherwise, shall not be deemed to be a successor to Seller in any way whatsoever including but limited to any collective bargaining agreement entered into by Seller in any respect including, but not limited to, any and all issues related to or arising out of (a) Seller's Pension funding obligations or related obligations under any Company Benefit Plan, (b) any collective bargaining agreements entered into by Seller, or (c) any environmental issue related to the Business, the Purchased Assets or the Real Property shall have been fully resolved to Buyer's satisfaction at Buyer's sole discretion.

9.10   No Material Adverse Change or Adverse Litigation. As of the Closing Date there shall not be any event, development, condition or pending or threatened litigation that has, had, or could reasonably be expected to have a material adverse effect on the Purchased Assets or the Business post-Closing, or Buyer's ability to operate the Purchased Assets or the Business post-Closing in the manner operated by Seller immediately prior to Closing.

9.11.   Lenders Approval. The Company's lenders shall have consented in a form and manner reasonably acceptable to the Buyer regarding the transactions contemplated in this Agreement and the Transition Services and Funding Agreement.

## ARTICLE X
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to sell the Purchased Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

10.1.   Court Approval. The entry of an order by the Court approving this Transaction and payment of the Purchase Price.

10.2.   Accuracy of Representations. All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

10.3.   Buyer's Performance.

(a)   All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)     Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to this Agreement and must have made the cash payments required to be made by Buyer pursuant to this Agreement.

10.4.   Consents. Each of the Authorizations, if any, must have been obtained and must be in full force and effect.

10.5.   No Injunction. There must not be in effect any Law or any injunction or other order that (a) prohibits the sale of the Purchased Assets by Seller to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

## ARTICLE XI
## TERMINATION

11.1.   Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Seller and Buyer;

(b)     by Buyer if the milestones set forth at Section 7.6 are not (i) met by Seller or (ii) waived, amended, or extended by Buyer;

(c)     by Buyer, if (i) Sellers enter into a definitive agreement with respect to an alternative transaction with respect to the Business with a party other than Buyer, or (ii) Seller files a pleading with the Court supporting or seeking approval of such an alternative transaction;

(d)     by Buyer if the Closing Date shall not have occurred by January 26, 2026, as may be extended by the Parties;

(e)     by Buyer, if Seller and/or Company breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform cannot be, or has not been, cured within five (5) business days following delivery of written notice to the Seller of such breach or failure to perform and (iii) has not been waived by Buyer;

(f)     by Buyer, (i) if (with respect to the Company, other than as a result of a request by the Company or any Seller) the Court enters an Order dismissing the Receiver from his duties, (ii) the Company commences (whether filed by the Receiver or otherwise) or becomes subject to a petition under Title 11 of the United States Code;

(g)     by Buyer or Seller if the Court or any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 10.01(i) shall not be available to any Party if such Order was primarily caused by (i) such Party's material breach of any provision of this Agreement or (ii) such Party's failure to comply in any material respect with its obligations hereunder;

(h)     By Seller, if Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement, including Buyer's funding obligations under section 2.7 of this Agreement, and such breach or failure to perform cannot be, or has not been, cured within five (5) business days following delivery of written notice to the Buyer of such breach or failure to perform and has not been waived by Seller.

(i)     The Party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1(a)) shall give written notice of such termination to the other Party in accordance with Section 12.1. For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 11.1 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 10.1 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2.    Effect of Termination.    If this Agreement is terminated as permitted by Section 11.01(i) this Agreement shall become null and void and of no further force, except for the provisions of Section 5.1, Section 6.2, this Section 11.2, and Article 12, which shall survive such termination of this Agreement and remain in full force and effect.

**ARTICLE XII**
**MISCELLANEOUS**

12.1    Entire Agreement; Amendments; Waiver.

(a)     Each of the Parties to this Agreement represents, warrants, covenants, and agrees that this Agreement, including all Exhibits comprise a single, unitary, indivisible, and non-severable agreement governing the purchase and sale of the Seller's Business, as defined in this Agreement. Although this Agreement may address a discrete subject matter, the treatment of such subject matter in separate documents does not signify that each constitutes a separate agreement; instead, such treatment is intended to facilitate articulation of the terms and conditions of the overall unitary and indivisible transaction. The use of the expressions "unitary," "indivisible," and "non-severable" to describe this Agreement is not merely for convenient reference. It is the conscious choice and the express intent of the Parties to enter into a unitary, indivisible, and non-severable transaction. Each of the Parties agrees that from an economic point of view this Agreement reflect one indivisible and non-severable economic bargain between Seller and Buyer and its affiliates, all other provisions of this Agreement have been negotiated and agreed to collectively as a single, composite, inseparable transaction, and that any one component of the transaction would not have been entered into other than as a part of the overall transaction. Except as expressly provided in this Agreement for specific isolated purposes (and in such cases only to the extent expressly so stated, it otherwise being presumed that this paragraph is applicable), (i) all provisions of this Agreement, including definitions, commencement and expiration dates, monetary provisions, use provisions, breach, default, enforcement and termination provisions, and assignment, are integral to the entire transaction and are not severable; (ii) the economic terms of the transaction would have been substantially different had separate transactions been acceptable to Seller and Buyer and its affiliates; and (iii) the provisions of this Agreement will at all times be construed, interpreted and applied such that

24

the intention of all parties to effect a unitary, indivisible transaction will be preserved and maintained.

    (b)  The Parties agree that for all purposes, this Agreement constitute one indivisible and non-severable agreement dealing with and covering one legal and economic unit which must be transferred, assigned, rescinded, assumed, or rejected (as applicable) as a whole with respect to all (and not less than all) of the obligations covered under this Agreement or any Ancillary Agreements.

    (c)  The terms and provisions of this Agreement are hereby deemed incorporated in all of the Ancillary Agreements as though fully set forth therein and made a part thereof.

    (d)  No amendment to or modification of this Agreement shall be effective unless it shall be in writing and signed by each of the Parties.

    (e)  No provisions of this Agreement or rights hereunder may be waived other than by a writing signed by the Party waiving such provisions or rights.

  12.2. <u>Invalidity</u>. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and, to such end, the provisions of this Agreement shall be severable.

  12.3. <u>Specific Performance</u>. In addition to any and all other remedies that may be available at law or in equity, the Parties shall be entitled to an injunction or injunctions to prevent or cease breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, without proof of actual damages or inadequacy of legal remedy and without bond or other security being required.

  12.4. <u>Expenses</u>. Except as otherwise provided herein, each Party will pay all of its own costs and expenses incident to its negotiation and preparation of this Agreement and the Transactions.

  12.5. <u>Public Announcements</u>. All press releases or other public communications of any nature whatsoever relating to the Transactions, and the method of the release for publication thereof, shall be subject to the prior mutual approval in writing of Buyer and Seller.

  12.6. <u>Notices</u>. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given by delivery in person, by facsimile, by nationally recognized overnight courier or by registered or certified mail (postage prepaid, return receipt requested) to each other Party as follows:

If to Buyer:

    Pennsylvania Food Corporation
    Attn: Dan Moore
    1530 La Dawn Drive
    Portage, WI 53901

25



Email: dmoore@morskibrands.com
Phone: 608-742-2494

with a copy (which shall not constitute notice to Buyer) to:

Foley & Lardner LLP
Attn:   Eric Lauria-Banta
150 East Gilman Street, Suite 5000
Madison, WI 53703
Email: elauria-banta@foley.com
Phone: 608-257-5035

-and-

Foley & Lardner LLP
Attn:   Tim Mohan
1144 15th Street, Suite 2200;
Denver, CO 80202
Email: tmohan@foley.com
Phone: 720-437-2000

If to Seller:

JS HELD,LLC, d/b/a Morris Anderson & Associates, LLC
Attn:   Mark Welch
1788 Scarlett Dr.
Pittsburgh, PA 15241
Email: Mark.Welch@jsheld.com
Phone: 412-498-8258

with a copy to (which shall not constitute notice to Seller or Company):

Campbell and Levine, LLC
Attn:   Paul Cordaro
        Alexis Leventhal
310 Grant Street, Suite 1700
Pittsburgh, PA 15219
Email: pcordaro@camlev.com
Email: aleventhal@camlev.com
Phone:  412-261-0310

Such notice shall be deemed to be received when delivered if delivered personally, or the next Business Day after the date sent if sent by a United States national overnight delivery service, or three (3) Business Days after the date mailed if mailed by certified or registered mail, or upon receipt of confirmation of delivery if sent by email. Any notice of any change in such address shall also be given in the manner set forth above.

26

12.7.    Successors and Assigns; No Third-Party Beneficiaries. The rights of a Party under this Agreement shall not be assignable by such Party without the written consent of the other Parties; provided, however, that, the Buyer may assign this Agreement without the written consent of the other Parties to any Affiliate of the Purchaser or to any parties providing debt financing to the Buyer or its Affiliates or relating to the Transactions hereby for purposes of creating a security interest herein or otherwise assigning as collateral in respect of such debt financing, but no such assignment shall relieve the Buyer of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Except as expressly provided herein, nothing in this Agreement is intended or shall be construed to confer upon any Person not a Party hereto any right, remedy or claim under or by reason of this Agreement; *provided* that the Non-Recourse Parties shall be and be deemed to be third-party beneficiaries of this Agreement solely with respect to Section 12.15 hereof.

12.8.    Governing Law. This Agreement and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of Pennsylvania without giving effect to any choice or conflict of law provision or rule (whether of the State of Pennsylvania or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Pennsylvania.

12.9.    Dispute Resolution. The Buyer and the Seller agree that it is their intent to, but that they are not required to, attempt to settle any dispute that may arise under this Agreement, by consultation and negotiation with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to the Buyer and the Seller. If Buyer and Seller are unable to settle any dispute, they may agree to resolve the dispute with the assistance of mediation or through final binding arbitration. If they are unable to reach an agreement through mediation or do not agree on final binding arbitration, either of them may initiate court proceedings to resolve the dispute solely in the Court.

12.10.    Seller's Records. Seller shall have reasonable prompt access for a period of three years after the Closing of its books and records in possession of Buyer.

12.11.    Venue. The Parties hereby agree that any dispute or controversy arising out of or related to this Agreement or the transactions contemplated hereby shall be conducted solely and exclusively by the Court. Each Party hereby irrevocably consents and submits to the sole exclusive personal jurisdiction of and venue of the Court and waives all rights to assert arguments of an inconvenient or improper forum. Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in Section 12.6.

12.12.    Execution in Counterparts; Facsimile. This Agreement may be executed in two or more counterparts, via facsimile, .pdf or electronic delivery, each of which shall be considered an original instrument, and all of which, when taken together, shall constitute one and the same agreement.

12.13.    Representation of Counsel.  The Parties to this Agreement are represented by counsel and represent that they have had the opportunity to consult with their respective counsel

prior to entering into this Agreement. All Parties' counsel have participated in the drafting of this Agreement. Buyer and on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

12.14. <u>Receiver Liability</u>. Notwithstanding anything to the contrary, nothing in this Agreement shall be binding personally upon Receiver and no deficiency judgment or other action for personal liability shall be brought or maintained against Receiver for breach of this Agreement, it being understood and agreed that any liability of the Receiver under this Agreement shall be expressly limited and exculpated to the Receivership Assets (as defined in the Receiver Order) for the satisfaction of Auctioneer's remedies in the event of Receiver's default hereunder. The parties mutually agree that this Section is and shall be considered an integral part of this Agreement.

12.15. <u>Non-Recourse</u>. Notwithstanding anything herein to the contrary, no current or former director, manager, officer, agent, controlling person or representative of, Affiliate (or director, manager, officer, agent, controlling person or representative of an Affiliate) of, or direct or indirect equity owner in, any Buyer (collectively, the "Non-Recourse Parties") shall have any personal liability to either Seller, Company, any other Person as a result of, arising from, the breach or alleged breach of any representation, warranty, covenant, agreement or obligation of Buyer in this Agreement or any other Transaction Document or otherwise in connection with the transactions contemplated hereby. In no event shall any Party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Recourse Party, in each case, whether in tort, contract or otherwise. For the avoidance of doubt, and in the event of a breach of this Agreement by Buyer, nothing herein shall prohibit or prevent Seller from seeking to collect its actual damages.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the day and year first above written.

**BUYER:**

**PENNSYLVANIA FOOD CORPORATION,**
a Wisconsin Corporation

By:_____

_CEO, PFC_____, Authorized Signatory

**SELLER:**

:

**RECEIVER, JS Held, LLC d/b/a Morris Anderson & Associates, Ltd.**

By:_____

_____, Authorized Signatory

*[Signature page to Asset Purchase Agreement]*

1

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the day and year first above written.

**BUYER:**

**PENNSYLVANIA FOOD CORPORATION,**
a Wisconsin Corporation


By:_____
_____, Authorized Signatory


**SELLER:**

**RECEIVER, JS Held, LLC d/b/a Morris Anderson & Associates, Ltd.**


By:_____
Mark Welch , Authorized Signatory


*[Signature page to Asset Purchase Agreement]*

1

SCHEDULE 1
Assumed Contracts and Leases

**Equipment Rental Agreements and Equipment Leases:[1]**

| Lender | Agreement / Equipment |
|---|---|
| REF | Equipment Rental Agreement |
| Wells Fargo Equipment Finance | Lease Agreement 001 dated 12/27/23<br>Lease Agreement 002 dated 4/15/21<br>Lease Agreement 003 dated 4/27/21 |
| Leaf Capital Funding, LLC | Finance Agreement dated 2/23/21<br>Finance Agreement dated 3/18/21<br>Finance Agreement dated 7/23/21 |
| Byline Financial Group | Finance Lease Agreement No. 57549<br>Finance Lease Agreement No. 57729<br>Finance Lease Agreement No. 57730<br>Finance Lease Agreement No. 57732<br>Finance Lease Agreement No. 56045<br>Finance Lease Agreement No. 56139 |
| Meridian | Bun Saw & Detopper Conveyor |
| New Lane Finance | Equipment Finance Agreement #APP-000018852 |
| Xerox | One - New Xerox B8155H2 206589, One - New Xerox C8170H2 206590, One - New Xerox C8135T2 206591, One - New Xerox C8135T2 206592 |
| Premier | Master Lease Agreement No. 1601221 and all Lease Schedules related thereto |

---

[1] This Schedule 1 may be modified by Buyer between the date of the executed APA and the Closing Date.

Sale Budget

**Fourth Street Foods**
**13 Week Cash Flow Forecast & Loan Projections**

| FORECAST | | | | |
|---|---|---|---|---|
| **Week Ending Saturday** | 3-Jan-26 | 10-Jan-26 | 17-Jan-26 | 24-Jan-26 |
| | Forecast | Forecast | Forecast | Forecast |
| **Week # :** | 1 | 2 | 3 | 4 |
| **SALES** | $ 759,952 | $ 780,960 | $ 780,960 | $ 780,960 |
| **Inflows** | | | | |
| Collections | 294,672 | 356,979 | 763,660 | 761,537 |
| Other | - | - | - | - |
| **Total Inflows** | **294,672** | **356,979** | **763,660** | **761,537** |
| **Disbursements** | | | | |
| **Operating:** | | | | |
| Payroll | 123,000 | 344,643 | 105,500 | 262,879 |
| COGS Disbursements | 200,000 | 514,840 | 514,840 | 514,840 |
| SG&A Disbursements | 184,613 | 170,656 | 159,959 | 129,567 |
| **Total Operating Disbursements** | **507,613** | **1,030,139** | **780,299** | **907,286** |
| **Operating Net Cash Flow** | **(212,941)** | **(673,160)** | **(16,639)** | **(145,749)** |
| **Roll Forward Op. Net Cash Flow** | **(212,941)** | **(886,101)** | **(902,740)** | **(1,048,489)** |
| **Non Operating Disbursments:** | | | | |
| Disbursements | 500,000 | - | - | - |
| Debt | 4,673 | - | 11,686 | - |
| **Total Non Operating** | **504,673** | **-** | **11,686** | **-** |
| **Total Disbursements** | **1,012,286** | **1,030,139** | **791,985** | **907,286** |
| **Total Net Cash Flow** | **(717,614)** | **(673,160)** | **(28,325)** | **(145,749)** |
| **Roll Forward Net Cash Flow** | **(717,614)** | **(1,390,774)** | **(1,419,099)** | **(1,564,848)** |
| **Cash Balance** | | | | |
| **Beginning Cash** | $ 440,597 | $ 122,983 | $ 149,823 | $ 321,498 |
| Inflows | 294,672 | 356,979 | 763,660 | 761,537 |
| Advances | 400,000 | 700,000 | 200,000 | |
| Outflows | (1,012,286) | (1,030,139) | (791,985) | (907,286) |
| **Ending Cash** | **122,983** | **149,823** | **321,498** | **175,749** |

SCHEDULE 3[1]
Purchased Equipment

QTY(1)  Pack Line 43, To Include:
1 FEMC 6" X 40' Bowl Transfer Belt Conveyor, Asset #with Denester
1 Precision PMD Dial Filler
1 Precision PMD Dial Filler
1 FEMC Dial Filler
1 Manufacturer Unknown Waterfall Cheese Depositor; (In-House Built); with PLC Control
1 Unknown Manufacturer Heat Sealer; with 10' Sealing Conveyor; Die Cut Assembly; and Container Transfer System
1 Ceia Model T/SLM21-400200007 Metal Detector, S/N 21200229001, (2012); 400mm x 200mm Aperture
1 Ishida Model DACS-GN-S060-34/SS-I-S Checkweigher, S/N 87833, (2012)
1 Adco Model 15DBC105-SS Cartoner, S/N 6130-HG, (2020); with Feed and Exit Conveyors; Nordson Model ProBlue Flex Gluing System; and Allen-Bradley Model PanelView PLC Controller
1 Keyence Model MK-G1000 Ink Jet Printer, S/N 129G1008844621A2E
1 Manufacturer Unknown 17" x 12' Rubber Belt Conveyor
1 3M Model 3M-Matic 8000A Case Sealer, S/N 22408, (2021)
1 Keyence Model MK-G1000 Ink Jet Printer, S/N 129G100654421A4E
Qty(1) Pack Line 42, To Include:
1 Precision Replacement 6" x 40' Bowl Transfer Belt Conveyor, Asset #with Denester
1 Precision PMD Dial Filler
1 FEMC Dial Filler
1 Precision PMD Dial Filler
1 FEMC Dial Filler
1 Manufacturer Unknown 2-Station Stainless Steel Piston Filler, S/N DL122; with Stainless Steel Feed Hopper
1 Manufacturer Unknown Waterfall Cheese Depositor; (In-House Built); with PLC Control
1 Manufacturer Unknown Air Filler
1 FEMC Heat Sealer; with 10' Sealing Conveyor; Die Cut Assembly; and Container Transfer System
1 Loma Model IQ3ST Metal Detector, S/N 038821
1 Ishida Model DACS-G-S015-24/CR-I-S Checkweigher, S/N 86087, (2012)
1 Manufacturer Unknown 12" x16' Plastic Slat Belt Conveyor
1 Adco Model 15DBC105-SS Cartoner, S/N 6278-HG, (2022); with Feed and Exit Conveyors; Nordson Model ProBlue 4 Gluing System; and Allen-Bradley Model PanelView PLC Controller
1 Keyence Model MK-G1000 Ink Jet Printer, S/N 129G100843691A2E
 1 FEMC 6" x 40' Bowl Transfer Belt Conveyor; with Denester
1 Precision PMD Dial Filler
1 Precision PMD Dial Filler
1 FEMC Dial Filler
1 Grote Model AP-40 Waterfall Cheese Depositor, S/N 1036627; (In-House Built); with PLC Control
1 Manufacturer Unknow Heat Sealer; with 10' Sealing Conveyor; Die Cut Assembly; and Container Transfer System
1 Loma Model IQ3 Metal Detector, S/N KIMU03853U
1 Ishida Model DACS-GN-S015-23/SS-I-S Checkweigher, S/N 100544794, (2021)
1 Manufacturer Unknown 10" x 8' Plastic Slat Belt Conveyor
1 Adco Model 12BC100EC Cartoner, S/N 3668-HG; with Feed and Exit Conveyors; Nordson Model ProBlue 7 Gluing System; and Allen-Bradley Model PanelView PLC Controller
1 Videojet Model 1580 Ink Jet Printer, S/N 19289037C54Zh, (2019)
2 Dorner Model 2200 Series 8" x 8' Rubber Belt Conveyors
1 Dorner Model 2200 Series 8" x 18' Twin Rubber Belt Conveyor
1 Douglas Machine Case Erector, S/N M-3784; with Nordson Model ProBlue 10 Glue System; and Allen-Bradley Model Dataliner Date Coder
1 Marsh Model Patrion Plus Printer, S/N 193172001BL; with Dual Heads and Belt C
1 Raque Model PF-25-2 2-Station Stainless Steel Piston Filler, S/N 91-071C, (1991); with Feed Hopper
Manufacturer Unknown Air Filler
2 Manufacturer Unknown 2-Fan Evaporators
2 Krack 2-Fan Evaporators
1 Bohn 2-Fan Evaporator
1Precision PMD Dial Filler
1 FEMC Dial Filler
3 Krack 2-Fan Evaporators
1 Kramer 2-Fan Evaporator
2 Heatcraft 2-Fan Evaporators
1 Loveshaw Model Little David LD3SB/2 Case Sealer, S/N 3811296SBP/60, Asset #TM-08
1 Videojet Model 3330 Laser Printer, S/N 16221001LWD, (2016); with Portable Stand; (Not In Use)
1 Mettler Toledo Model XC Checkweigher, S/N 36600005; (Not In Use)

[1] This Schedule 3 may be modified by Buyer between the date of the executed APA  and the Closing Date.

SCHEDULE 3
Purchased Equipment

1 SPX Model 030U1 Positive Displacement Pump, S/N 1000002918555, (2016), 2 hp
1 Manufacturer Unknown 30" x 30" x 36" Stainless Steel Mixing Tank; with Leeson Agitator
1 Manufacturer Unknown 42"D x 19" Stainless Steel Mixing Kettle
QTY(1) Pack Line 31, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Conveyor Solutions Bun Slicer
1 Manufacturer Unknow 6" x 16' Twin Plastic Belt Conveyor
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 23" x 10' Plastic Slat Belt Conveyor
1 Fuji Model FW3710 High Speed Horizontal Form, Fill, and Seal Machine, S/N 011810, (2007); with Touch Screen PLC Control;
1 Videojet Model DataFlex 6530 Printer
1 Mettler Toledo Model V4-1 Metal Detector, S/N 132957, (2015)
1 All-Fill Model PW-12 Checkweigher, S/N 980886, Asset #CW-03, (2020)
1 Manufacturer Unknown 36" Stainless Steel Accumulator
1 Loveshaw Model Little David LD-19SB/60 Case Sealer, S/N 142012419SB/60
1 Squid Ink Model Co-Pilot 128A Printer
QTY(1) Pack Line 32, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Conveyor Solutions Bun Slicer
1 Manufacturer Unknown 8" x 12' Plastic Slat Belt Conveyor
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 12" x 15' Plastic Slat Belt Conveyor
1 Fuji Model FW3710 High Speed Horizontal Form, Fill, and Seal Machine; with Touch Screen PLC Control
1 Videojet Model DataFlex 6530 Printer
1 Mettler Toledo Model V4-1 Metal Detector
1 All-Fill Model PW-12 Checkweigher, S/N 980897, (2020)
1 Manufacturer Uknown 36" Stainless Steel Accumulator
1 Loveshaw Model Little David LD-19SB/60 Case Sealer, S/N 142012519SB/60
1 Squid Ink Model Co-Pilot 128A Printer
2 Krack 2-Fan Evaporators
2 Manufacturer Unknown 2-Fan Evaporators
1 Manufacturer Unknown 2-Fan Evaporator
QTY(1) Pack Line 23, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 20" x 18' Plastic Slat Belt Conveyor
1 Stainless Steel Tilting Bread Hopper
1 Doboy Model J Horizontal Flow Wrapper, S/N 97-19757, (1997)
1 Dorner Model 2200 Series 10" x 10' Rubber Belt Conveyor
1 Adco Model 15DBC105-SS Cartoner, S/N 3805-HG; with ITW Model Dynatec Glue System
1 Videojet Model 1580 Ink Jet Printer, S/N 19289040C54ZH, (2019)
1 All-Fill Model PW-12 Checkweigher, S/N 980913, (2020)
1 Loma Model IQ4 Metal Detector, S/N Q4W45-20-54471D, (2020)
1 3M Model 3M-Matic 8000A Case Sealer, (2021)
1 Squid Ink Model Co-Pilot 128A Printer
QTY(1) Pack Line 22, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 6" x 18' Twin Plastic Belt Conveyor
1 Conveyor Solutions Bun Slicer
1 Stainless Steel Tilting Bread Hopper
1 Kleenline 12" x 15' Plastic Slat Belt Conveyor
1 Doboy Model J Horizontal Flow Wrapper, S/N 95-17427RS, (1995)
1 Dorner Model 2200 Series 10" x 12' Rubber Belt Conveyor
QTY(1) Pack Line 21, To Include:
1 Stainless Steel Tilting  Bread Hopper
1 Manufacturer Unknown 6" x 18' Twin Plastic Belt Conveyor
1 Conveyor Solutions Bun Slicer
1 Stainless Steel Tilting Bread Hopper\
1 Manufacturer Unknown 18" x 18' Plastic Slat Belt Conveyor
1 Doboy Model J Horizontal Flow Wrapper, S/N 97-19708UG, (1997)
1 Adco Model 12BC150-SS Cartoner, S/N 2637-HG; with Feed and Exit Conveyors; Norson Model Microset Gluing System; and Allen-Bradley Model PanelView PLC Controller

SCHEDULE 3
Purchased Equipment

1 Videojet Model 1580 Ink Jet Printer, S/N 20196013C54ZH, (2020)
1 Ishida Model DACS-G-S015-24/CR-I-S Checkweigher, S/N86086, (2012)
1 Loma Model IQ4 Metal Detector, S/N Q4W45-20-52551D, (2020)
1 Loveshaw Model Little David LD3SB/2 Case Sealer
2 Bohn 3-Fan Evaporators
1 Bohn 3-Fan Evaporator
1 Manufacturer Unknown 2-Fan Evaporator
1 Larkin 2-Fan Evaporator
QTY(1) Pack Line 11, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 6" x 18' Twin Plastic Belt Conveyor
1 Conveyor Solutions Bun Slicer
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 18" x 15' Plastic Slat Belt Conveyor
1 Cambell Wrapper Model Pioneer Horizontal Flow Wrapper, S/N 5687-0392
1 Adco Model 15DB105-EC Cartoner, S/N 4031-TK; with Nordson Model ProBlue 7 Glue System
1 Videojet Model 1580 Ink Jet Printer, S/N 19289038C54ZH, (2019)
1 Eriez Model Xtreme 14 x 8 Metal Detector, S/N 44712-2
1 Ishida Model DACS-GN-S060-34/SS-I-S Checkweigher, S/N 100349967, (2018)
1 Manufacturer Unknown Case Sealer
1 Squid Ink Model Co-Pilot 500 Printer
QTY(1) Pack Line 12, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 6" x 18" Twin Plastic Belt Conveyor
1 Conveyor Solutions Bun Slicer
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 6" x 15' Twin Plastic Belt Conveyor
1 Campbell Wrapper Model Pioneer Horizontal Flow Wrapper, S/N 5686-0392
1 Manufacturer Unknown 12" x 12' Plastic Slat Belt Conveyor
1 Dorner Model 2200 Series 10" x 6' Rubber Belt Conveyor
1 Manufacturer Unknown 12" x12' Rubber Belt Conveyor
QTY(1) Pack Line 13, To Include:
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 6" x 18' Twin Plastic Belt Conveyor
1 Conveyor Solutions Bun Slicer
1 Stainless Steel Tilting Bread Hopper
1 Manufacturer Unknown 8" x 15' Plastic Slat Belt Conveyor
1 Doboy Model J Horizontal Flow Wrapper, S/N 88-24917, (1988)
1 Wrabacon 10" x 8' Plastic Belt Conveyor
1 Adco Model 12BC125EC Cartoner, S/N 2613-HG; with Nordson Model ProBlue 7 Glue System
1 Videojet Model 1580 Ink Jet Printer, S/N 21306019C54ZH, (2021)
1 Loma Model CW3 Checkweigher, S/N BCW72069-51957D, (2020)
1 Loma Model IQ4 Metal Detector, S/N Q4W45-20-52112D, (2020)
1 3M Model 3M-Matic 8000A Case Sealer, S/N 22802, (2022)
1 Marsh Model PatrionPlus Printer; with Dual Heads; and Belt Conveyor
3 Manufacturer Unknown 2-Fan Evaporators
2 Century 5-Fan Evaporators
6 Bohn 2-Fan Evaporators
2 Bohn 4-Fan Evaporators; Freezer #4
2 Bohn 4-Fan Evaporators Cooler #2
2 Manufacturer Unknown 4-Fan Evaporators; Cooler #2
2 Bohn3-Fan Evaporators; Freezer #3
2 KeepRite Refrigeration 3-Fan Evaporators; Freezer #1
1 Trenton 1-Fan Evaporator; Freezer #1
5 Kramer 3-Fan Evaporators; Freezer #5
2 Russell 4-Fan Evaporators; Freezer #5
1 Lot of Racking in Freezer #5, To Include: (2) Sections of 2D x 14'H Push Back Pallet Racking
4 Bohn 3-Fan Evaporators; Freezer #2
1 Russel Model VSD54L44 Condenser, S/N G98 53911-014, (1998)
2 Hussmann Freezer Condensers
1 Heatcraft Model BDVS2700L6D Condenser, S/N T13K04697, (2013)
1 Century Model DDXXX-P Condenser, S/N 11-XX-X00992-001-001

SCHEDULE 3
Purchased Equipment

2 Bohn Condensers
3 Hussmann Freezer Condensers 22 hp
1 Tyler 4-Fan Condenser
2 Hussmann Model HOCA2714RLMXU Freezer Condensers, S/N 0285-0009; and S/N 3186-0009, 27 hp
1 Manufacturer Unknown 2-Fan Condenser
Heatcraft Model LCD0300MDACDC1329 4-Fan Condenser, S/N T20G14567, (2020)
1 Century Model DV30H7-P 4-Fan Condenser, S/N 05-09-094216-007-001, (2009)
1 Hussmann Freezer Condenser
1 Hussmann Model HOCA1541FSMXU Freezer Condenser, S/N 0285-0006
1 Manufacturer Unknown Freezer Condenser
Hussmann Model HOCA2025RLMXU Freezer Condenser, S/N 0885-0010
1 Manufacturer Unknown 4-Fan Condenser
1 Lot of Rytec and Frank Doors on Freezera and Coolers Throughout Facility
1 Lot Throughout Test Kitchen, To Include:
2 Arctic Air 2-Door Stainless Steel Commercial Freezers; Frigidaire Upright Refrigerator; 8 Bench Top Scales; Tel-Tru Check-Set Thermometer Calibrator; Panasonic Microwave; Magic Chef Microwave Electric Oven, etc.
2 Videojet Model 1580+ Ink Jet Printers, S/N 24290022C65ZH; and S/N 24290003C65ZH, (2024)
1 Jet Model HVBS-7MW Horizontal Band Saw, S/N 100238570
1 Baileigh Model DP-1000G 20" Geared-Head Floor-Type Drill Press, S/N A1110630, (2011)
1 Bolton Model AT320 Lathe
1 Lincoln Electric Model Square Wave TIG 175 175-Amp Tig Welder, S/N M3121003071, (2012)
1 Lot Throughout Maintenance Department, To Include: HobartArc Welder; Hand Tools; H-Frame Shop Press; Double-End Grinder
1 Lot of Approximately (98) Sections of 24'H x 2D Adjustable Pallet Racking
9 Climate Control 3-Fan Evaporators (Each Valu: 1,000/1,500)
3 Heatcraft 2-Fan Condensers (Each Value: 2,000/3,000)
1 Century Model DV54L7-P 2-Fan Condenser, S/N 05-09-094216-001-001 (2009)
1Crown Model RC5535-35 3,500-Lb. Stand Up Riding Lift Truck, S/N 1A539882, Asset #N13, (2019)
1 Crown Model SC 5225-35 3,500- Lb. Electric Lift Truck, S/N 10131999, Asset #S43, (2015); 190" Lift, Solid Tire, Overhead Guard; with Side Shift
1 Crown Model FC5215-50 5,000-Lb. Electric Lift Truck, S/N 10055398, Asset #N12 (2017); 188" Lift, Solid Tire, Overhead Guard; with Side Shift
1 Crown Model SC5225-35 3,500-Lb. Electric Lift Truck, S/N 10132926, Asset#N18 (2015) 190" Lift, Solid Tire, Overhead Guard; with Side Shift; (Not In Service)
1 Crown Model RD5220-30 3,000-Lb. Stand-Up Riding Reach Type Electric Lift Truck, S/N 1A328131, Asset #N14, (2010); 210" Lift
1 Crown Model FC4510-50 5,000-Lb. Electric Lift Truck, S/N 9A227632, Asset #N15 (2016); 188" Lift, Solid Tire, Overhead Guard; with Side Shift (Not Inspected)
1 JLG Model 2030ES Electric Scissor Lift, S/N 20012690
1 Clark Model WPX45 4,500-Lb. Walk Behind Electric Pallet Truck, S/N WPX45-3544-8228CH, Asset #NPJ6
2 Crown Model WP3035-45 4,500-Lb. Walk Behind Pallet Tucks, S/N 7A272003, Asset #NPJ3; and S/N 10236366, Asset #NPJ2 (Each Value: 1,200/1,500)
1 Clark Model WPX45 4,500-Lb. Walk Behind Electric Pallet Truck, S/N WPX45-3978-8228CH, Asset #NPJ4
1 Crown Model WP3035-45 4,500-Lb. Walk Behind Electric Pallet Truck, S/N 7A256472, Asset # NPJ1
1 Clark Model WPX45 4,500-Lb. Walk Behind Electric Pallet Truck, S/N WPX45-3545-8228CH, Asset #NPJ5
2 Factory Cat Model Mini-HD Electric Floor Scrubbers (Each Value: 2,000/2,500)
1 Crown Model RC5545-40 4,000-Lb. Stand Up Riding Electric Pallet Truck, S/N 1A435107, Asset #N63, (2015)
1 Crown Model RMD6025-32 3,000-Lb. Stand Up Riding Reach Type Electric Lift Truck, S/N 1A440177, Asset #N65, (2014); 279" Lift
1 Crown Model RC5545-40 4,000-Lb. Stand Up Riding Electric Lift Truck, S/N 1A435106, Asset #N64, (2015)
1 Crown Model RMD6025-32 3,000-Lb. Stand Up Riding Reach Type Electric Lift Truck, S/N 1A440179, Asset #N61, (2014); 279" Lift
1 Crown Model RMD6025-32 3,000-Lb. Stand Up Riding Reach Type Electric Lift Truck, S/N 1A440178, Asset #N62, (2014) 279" Lift
1 Crown Model FC4514-50 5,000-Lb. Electric Lift Truck, S/N 9A211835          , Asset #N11
1 Crown Model SC5225-35 3,500-Lb. Electric Lift Truck, S/N 10140946, Asset #N16 (2015); 190" Lift, Solid Tire, Overhead Guard
1 Crown Model SC5245-40 4,000-Lb. Electric Lift Truck, S/N 10064027, Asset #N17, (2017); 190" Lift, Solid Tire, Overhead Guard
1 Crown Model SC5745-40 4,000-Lb. Electric Lift Truck, S/N 10541154, Asset #N18R   , (2022)
1 Crown Model SC5735-35 3,500-Lb. Electric Lift Truck, S/N 10523969, Asset #N66R, (2022)
1 Clark Model TMX25 5,000-Lb. Electric Lift Truck, S/N TMX250-5095-9803KF, Asset # N19R, (2014); (Not Inspected)

SCHEDULE 3
## Purchased Equipment

1 Yale Model GLC120MG LP Gas Lift Truck, S/N B818D02029T, Asset #N110, (1996)

1 Fairbanks Model FB2250 5,000 Lb. Digital Platform Scale; with 4' x4' Scale Deck

1 Kemco Model L/CO-PK 2,000,000-Btu/Hour Gas Fired Water Heater, S/N 28692, (2008); with Stainless Steel Hot Water Tank; and Pump Skid

1 Gateway Recycling Model V73HD Vertical Hydraulic Baler, S/N V73HD1505181

1 Marathon Equipment Model 6030 Vertical Hydraulic Baler, S/N 167927

1 Lot of Assorted Racking Throughout Warehouse, To Include: (50) Sections of 12' and 14' H Adjustable Pallet Racking; 4 Sections of 7D x 10'H Push Back Pallet Racking, and 5 Sections of 3D x 12'H Push Back Pallet Racking

1 Adam Equipment Model GK Series 5,000-Lb. Digital Platform Scale; with 4' x 4' Scale Deck

1 Fairbanks Model 2200 5,000-Lb. Digital Platform Scale; with 4' x 4' Scale Deck

1 Fairbanks 1,000-Lb. Digital Platform Scale; with 4' x 5' Scale Deck

1 Gardner Denver Model HR25-12 Horizontal Tank Mounted Reciprocating Air Compressor, S/N D213073, 25 hp

1 Gardner Denver Model Electra-Saver II EBE99N22 Rotary Screw Air Compressor, S/N S193867, (2005), 30 hp; with Airtac Refrigerated Air Dryer

1 Gardner Denver Model EBE990 Rotary Screw Air Compressor, S/N 282413, (2008), 20 hp

1 AirCel Model VF-250 Refrigerated Air Dryer, S/N R01-082526-23, (2023)

1 Gardner Denver Model L22 Horizontal Tank Mounted Rotary Screw Air Compressor, S/N D226130, (2022), 30 hp; with Model GSRN-150A-116 Refrigerated Air Dryer, S/N 87532, (2023), Mounted On Compressor

1 Lot of Miscellaneous Equipment Throughout Production, To Include: Stainless Steel Rack; Stainless Steel Sinks; Roller Carts; Tubs; Pallet Jacks; Various Conveyors; etc.

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model #: | Serial #: | Location: |
|---|---|---|---|---|---|
| Metal Detector | MD-001 | ErieZ | Xtreme 14 x 8 | 288032 | PACK 2/4 , Line 21 |
| Metal Detector | MD-002 | ErieZ | Xtreme 14 x 8 | 44712-1 | PACK 2/4 , Line 21 |
| Metal Detector- | MD-003 | ErieZ | Xtreme 14 x 8 | 334780 | PACK 3 , Line 31 |
| Metal Detector | MD-004 | Loma | IQ4 Metal Detector | Q4W45-20-43594D | PACK 5, Line 51 |
| Metal Detector Conveyor | MD-004 | Loma | Flex Conveyor | 25352 | PACK 5, Line 51 |
| Metal Detector | MD-005 | Loma | IQ4 Metal Detector | Q4W45-20-41833D | Storage |
| Metal Detector Conveyor | MD-005 | Loma | Flex Conveyor | FALV2-25129 | Storage |
| Metal Detector | MD-006 | Loma | IQ4 Metal Detector | Q4W45-20-44890D | Storage |
| Metal Detector Conveyor | MD-006 | Loma | Flex Conveyor | (B)WALV3-25530 | Storage |
| Metal Detector | MD-007 | Loma | IQ4 Metal Detector | Q4W45-20-44881D | PACK 6 , Line 61 |
| Metal Detector Conveyor | MD-007 | Loma | Flex Conveyor | (A) WALV3-25530 | PACK 6 , Line 61 |
| Metal Detector | MD-008 | Loma | IQ4 Metal Detector | Q4W45-20-52115D | PACK 5, Line 53 |
| Metal Detector Conveyor | MD-008 | Loma | Flex Conveyor | WMLV3-26785B | PACK 5, Line 53 |
| Metal Detector | MD-009 | Loma | IQ4 Metal Detector | Q4W45-20-52637D | PACK 6 , Line 64 |
| Metal Detector Conveyor | MD-009 | Loma | Flex Conveyor | WMLV3-26957B | PACK 6, Line 64 |
| Metal Detector | MD-010 | Loma | IQ4 Metal Detector | Q4W45-20-48613D | Pack 6 Line 62 |
| Metal Detector Conveyor | MD-010 | Loma | Flex Conveyor | WMLV3-26570 | Pack 6 Line 62 |
| Metal Detector | MD-011 | Loma | IQ4 Metal Detector | Q4W45-20-52110D | Storage |
| Metal Detector Conveyor | MD-011 | Loma | Flex Conveyor | WMLV3-26957A | Storage |
| Metal Detector | MD-015 | Loma | IQ4 Metal Detector | Q4W45-20-52225D | Pack 5, Line 52 |
| Metal Detector Conveyor | MD-015 | Loma | Flex Conveyor | | Pack 5, Line 52 |
| Metal Detector | MD-017 | Loma | IQ4 Metal Detector | Q4W45-20-52228D | Pack 6, Line 63 |
| Metal Detector Conveyor | MD-017 | Loma | Flex Conveyor | | Pack 6, Line 63 |
| TYSON Metal Detector | MD-012 | Mettler Toledo | M# V4 | 128023    ASSET# 17247-01 | PACK 7, L-73 |
| TYSON Metal Detector | MD-013 | Mettler Toledo | | 112781    ASSET# 900319 | PACK 7, L-74 |
| TYSON Metal Detector | MD-014 | Mettler Toledo | V4 | 128024    ASSET# 17244-03 | PACK 7, L-75 |
| TYSON Metal Detector | MD-016 | Mettler Toledo | Pro-K | 6077001    ASSET#40267 | Pack 7 ,Line 75 |
| Cheese Depositor | CD-01 | Raque | TU.3925-001.00 | 96-106-C | Pack 3 , Line 31 |
| Cheese Depositor | CD-02 | In house Built | | | Pack 2 ,Line 21 |
| Cheese Depositor | CD-03 | Grice Equipment | | | Pack 2, Line 22 |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Mixer | N/A | Panner | 11 | 1364-1960 | PACK 3 |
| Kettle | N/A | Chester Jenson | 70N10 | 9111-P | PACK 3 |
| Check Weigher | CW-01 | Ishida | DACS-GN-S015-23/SS-I-S | 100415140 | PACK 2, Line 22 |
| Check Weigher | CW-02 | Ishida | DACS-GN-S015-23/SS-I-S | 207193601 | Pack 3 , Line 31 |
| Check Weigher | CW-03 | Allfill | PW-12 | 980886 | PACK 7, Line 71-72 |
| Checkweigher | CW-04 | Allfill | PW-12 | 980885 | PACK 6 , Line 61 |
| Checkweigher | CW-05 | Ishida | DACS-GN-S060-34/SS-I-S | 100346612 | Pack 5 , Line 53 |
| Check Weigher | CW-06 | Ishida | DACS-GN-S015-23/SS-I-S | 100480809 | Pack 5, Line 52 |
| Check Weigher | CW-07 | Allfill | PW-12 | 980895 | Pack 6, Line 63 |
| Check Weigher | CW-08 | Ishida | DACS-G-S015-23/SS-1-5 | 100197093 | Pack 5 , Line 52 |
| Check Weigher | CW-09 | Ishida | DACS-GN-S015-23/SS-I-S | 100480810 | PACK 2, Line 21 |
| Check Weigher | CW-10 | Allfill | PW-12 | 980912 | PACK 5, Line 51 |
| TYSON Check Weigher | CW-012 | Mettler Toledo | XC3 Assett # 5000241273 | 36600223 | PACK 7, Line 74 |
| TYSON Check Weigher | CW-013 | Mettler Toledo | BWXC Assett # 085-41285 | 36601171 | PACK 7, Line 73 |
| TYSON Check Weigher | CW-014 | Mettler Toledo | BELTWEIGHXE    Assett # 17246-02 | 36600902 | PACK 7, Line 75 |
| Checkweigher | CW-015 | Ishida | DACS/GN-S015-23/SS-S-S | 100415146 | Pack 3, Line 31 |
| Check Weigher | CW-016 | Allfill | PW-12 | 980867 | Pack 6 Line 62 |
| Precison Main Drive | PMD-01 | Precision | PPMD-0615-001J | 200411 | PACK 3, Line 31 |
| Precision Main Drive | PMD-02 | Precision | FSBI-1018-001J | 200498 | PACK 2, Line 21 |
| Precision Main Drive | PMD-03 | Precision | FSBI-0619-001J | 200513 | PACK 2, Line 22 |
| Sealing Head Unit | SHU-01 | Precision | | | PACK 3, Line 31 |
| Sealing Head Unit | SHU-02 | Precision | | | Pack 2 ,Line 21 |
| Sealing Head Unit | SHU-03 | No info | | | Pack 2, Line 22 |
| Slicer Conveyor | SCO-01 | Conveyor Solutions | 3115-0000 | 9913 | PACK 5, Line 51 |
| Slicer Conveyor | SCO-02 | Conveyor Solutions | 3115-0000 | 9913 | PACK 5, Line 52 |
| Slicer Conveyor | SCO-03 | Conveyor Solutions | 3115-0000 | 9913 | PACK 5, Line 53 |
| Slicer Conveyor | SC0-04 | Conveyor Solutions | 3115-0000 | 9913 | PACK 6, Line 61 |
| Slicer Conveyor | SCO-05 | Conveyor Solutions | 3115-0000 | 9913 | PACK 6, Line 62 |
| Slicer Conveyor | SCO-06 | Conveyor Solutions | 3115-0000 | 9913 | PACK 6, Line 64 |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Combi Packaging Systems | N/A | Combi | CHL | CHL223102 | Room off pack 6 |
| Tape Machine | TM-01 | 3M | 700R | 50386 | Boiler Room |
| Tape Machine | TM-02 | 3M | 700R | 50301 | PACK 3, Line 31 |
| Tape Machine | TM-03 | 3M | 700R | 50396 | Belle Vernon |
| Tape Machine | TM-04 | BestPack | RS22-8H | 102009 | PACK 7, Line 73 |
| Tape Machine | TM-05 | BestPack | RS22-8H | 92024 | Belle Vernon |
| Tape Machine | TM-06 | Little David | LD35B/SP304 | 3811297SBP/60 | PACK 6 , Line 61 |
| Tape Machine | TM-07 | Little David | LD35B/SP304 | 3811295SBP/60 | Outside PACK 5 |
| Tape Machine | TM-08 | Little David | LD35B/2 | 3811296SBP/60 | Outside   Pack 4 |
| Tape Machine | TM-09 | Little David | LD35B/SP304 | 3811294SBP/60 | PACK 7 , Line 71-72 |
| Tape Machine | TM-10 | 3M | 7000R3 Pro | 30151 | PACK 6-Combi Room |
| Tape Machine | TM-11 | Little David | LD35B/SP304? | No info | |
| Tape Machine | TM-12 | 3M-MATIC | 8000A | 22472 | PACK 2, Line 22 |
| Tape Machine | TM-13 | 3M-MATIC | 8000A | 22469 | PACK 2, Line 22 |
| Tape Machine | TM-14 | 3M-MATIC | 8000A | 22100 | Pack 2,  Line 21 |
| Tape Machine | TM- 17 | 3M-MATIC | | 22601 | Pack 6 Line 64 |
| TYSON's TAPE MACHINE | TM-15 | Best Pack | Asset # 100-412044 | N/A | PACK 7, L-74 |
| TYSON's TAPE MACHINE | TM-16 | Best Pack | ASSET # 900445 | N/A | PACK 7, L-75 |
| Gravy Depositor | N/A | Precision PMD | FSBI-1117-001J | 200477 | PACK 3, Line 31 |
| Dial Filler | DF-001 | Precision | FSB1-0817-002J | 200473 | Pack 3, Line 31 |
| Dial Filler | DF-002 | Precision | FSB1-0817-002J | 200471 | Pack 3, Line 31 |
| Dial Filler | DF-003 | Precision | FSB1-0817-002J | 200472 | Pack 3, Line 31 |
| Dial Filler | DF-004 | Precision | FSB1-0817-002J | 200518 | Pack 3, Line 31 |
| Dial Filler | DF-005 | Precision | No info | No info | PACK 2 , Line 21 |
| Dial Filler | DF-006 | Precision | No info | No info | PACK 2 , Line 21 |
| Dial Filler | DF-007 | Precision | No info | No info | PACK 2 , Line 21 |
| Dial Filler | DF-009 | Precision | FSBI-1018-002J | 200514 | PACK 2, Line 22 |
| Dial Filler | DF-011 | Precision | FSBI-1018-001J | 200515 | out side pack 2 |
| Dial Filler | DF-008 | Precision | FSBI-1018-001J | 200516 | PACK 2, Line 22 |
| Dial Filler | DF-010 | Precision | FSBI-1018-001J | 200517 | PACK 2, Line 22 |
| Doboy Wrapper | DO-01 | Doboy | J Wrapper | 94-16598 | PACK 5, Line 53 |
| Doboy | DO-02 | Doboy | J Wrapper | 87-24212 | PACK 6, Line 61 |
| Doboy | DO-03 | Doboy | J Wrapper | 87-24248 | PACK 6, Line 62 |
| Doboy | DO-04 | Doboy | J Wrapper | 88-11021 | PACK 6, Line 64 |
| Doboy/Wrapper | DO-05 | Bosch | PACK101 | 17-34350 | PACK S , Line 52 |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Doboy/Wrapper | DO-06 | Bosch | PACK 101 | 17-34387 | PACK 5, Line 51 |
| Doboy/Wrapper | DO-07 | mustang 4 | | 9416183 | Pack 6 Line 63 |
| Doboy (Tyson) | FUJI-01 | Fuji Wrapper | FW3700@7 | 023504 | PACK 7, Line 75 |
| Doboy (Tyson) | FUJI-02 | Fuji Wrapper | FW3700 | 034804 | PACK 7, Line 73 |
| Doboy (Tyson) | Cambell 01 | in house tyson made | ASSET # 5000242579 | No info | PACK 7, Line 74 |
| Cartoner | CAR-01(PA) | Adco | 15DBC105-EC | 3686HG | PACK 2, Line 22 |
| Cartoner | CAR-02 | Thiele | 01-CMC | 9600 | Pack 3, Line 31 |
| Cartoner | CAR-03 | Adco | 15E60EC | 29131HG | Pack 5 , Line 52 |
| Cartoner | CAR-04 | Adco | 1ZBC100EC | 3670HG | Pack 5, Line 53 |
| Cartoner | CAR-05 | KlikLok Corp. | HS11098 | 316 | PACK 6, Line 63 |
| Cartoner | CAR- 06 | KlikLok Corp. | HSK11095 | 87 | Pack 5 , Line 53.5 |
| Cartoner | CAR-07 | KlikLok Corp. | HS11098 | 345 | PACK 6, Line 61 |
| Cartoner | CAR-08 | Adco | 15DOTSS | 2735HG | PACK 5, Line 51 |
| Cartoner | CAR-09 | FMS | 2000ML | 1157 | PACK 6 , Line 62 |
| Cartoner *TYSON's | CAR-11 | Adco | 15DBC105-WD-RH | 5818-HG | PACK 7 , , Line 75 |
| Cartoner *TYSON's | CAR-12 | Adco | 15D105-WD | 5243HG | PACK 7, Line 73 |
| Cartoner *TYSON's | CAR-13 | Adco | 15DBC105-EC | 4031TK | PACK 7, Line 74 |
| CARTONER | CAR-14 | Kliklok | HSK11095 | 33 | PACK 6, Line 64 |
| Cartoner | CAR-16 | Adco | 12BC-120-WD | 5354HG | Pack 2 Line 21 |
| Retail Printer | PRT-01 | Markem-Image | 9028 | CNN14440288 | PACK 5 |
| Retail Printer | PRT-02 | Markem-Image | 9028 | CN14520037 | In Shop |
| Retail Printer | PRT-03 | Markem-Image | 9028 | US16490375 | PACK 6 |
| Retail Printer | PRT-04 | Markem-Image | 9028 | US16490374 | Pack 2 Line 22 |
| Retail Printer | PRT-05 | Markem-Image | 9028 | US17100208 | In Shop |
| Retail Printer | PRT-07 | Markem-Image | 9028 | US17430268 | Pack 7 |
| Retail Printer | PRT-08 | Markem-Image | 9028 | US17430269 | In Shop |
| Retail Printer | PRT-09 | Markem-Image | 9028 | US15440189 | PACK 7 |
| Retail Printer | PRT-10 | Markem-Image | 9029 | US19310041 | PACK 7 |
| Retail Printer | PRT-11 | Markem-Image | 9029 | US19310040 | Pack 3 |
| Retail Printer | PRT-06 | Markem-Image | 9410 | US17230204 | Pack 5 |
| Retail Printer | PRT-12 | Markem-Image | 9028 | US15270186 | In shop |
| Retail Printer | PRT-13 | Markem-Image | 9029 | CN22210402 | In shop |
| Retail Printer | N/A | Videojet | 1580 | 19289039C542H | Pack 2 |
| Retail Printer | N/A | Videojet | 1220 | 17164002621ZH | Pack 7 |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 190301019BL | N/A |
| Printer Pump | N/A | Videojet | 26278 | 193612002BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 203301015BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 203301013BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 203301053BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 203381014BL | N/A |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 203301014BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 35610 | 190291016BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | 1220 | 17164002C21ZH | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 182131024BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 182321013BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 21355101BBL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 213551019BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 190301018BL | N/A |
| Unicorn 2 Printer Head | N/A | Videojet | | 213541022BL | N/A |
| Conveyor | CO-001 | Stainless steel 6 FT 2"x1' | Plastic Modular belt | | Pack 3, Line 31 |
| Conveyor | CO-002 | Kamflex 14" x 14' 6" vinyl | 704-004 | 90132 or 90123 | Pack 3, Line 31 |
| Conveyor | CO-003 | 19' x 16' 1.25 | Plastic Modular belt | | Pack 3, Line 31 |
| Conveyor | CO-004 | In House Built 10" x 4 ft | Vinyl Belt | | Pack 3, Line 31 |
| Conveyor | CO-005 | In House Built 12" x 6ft | Plastic Modular belt | | Pack 2/4 ,Line 21 |
| Conveyor | CO-006 | Leason Motor 7.5" x 8ft | Table Top conveyor | | Pack 2/4, Line 22 |
| Conveyor | CO-007 | KP Fabrications 26" x 15'6' | Plastic Modular Belt | | Pack 2/4, Line 21 |
| Conveyor | CO-008 | In House Built 7.5"x 5'4" | Plastic Modular Belt | | Pack 2/4,Line 22 |
| Conveyor | CO-009 | spantech 38ft L x1.5 ft w | Plastic Modular Belt | | Pack 7, Line 71 |
| Conveyor | CO-010 | spantech 38ft L x1.5 ft w | Plastic Modular Belt | | Pack 7 Line 72 |
| Conveyor | CO-011 | Dorner 12" x 3ft | 75009288 | 841040-1-1-2 | Pack 5, Line 53.5 |
| Conveyor | CO-012 | Dorner | 75009288 | 844741-1-1-2 | In Shop |
| Conveyor | CO-013 | In House Built 12"13' | Plastic Modular Belt | | Pack 5,Line 51 |
| Conveyor | CO-014 | In House Built 10" x 4 ft | Vinyl Belt | | Pack 5, Line 51 |
| Conveyor | CO-015 | Dorner 8 X 36" Vinyl Belt | 75009218 | 836919-1-1-1 | Pack 7, Line 73 |
| Conveyor | CO-016 | In House Built 12" x 15ft | Plastic Modular belt | | Pack 5, Line 52 |
| Conveyor | CO-017 | In House Built 13" x 13'9 | Plastic Modular belt | | Pack 5, Line 53 |
| Conveyor | CO-018 | In House Built | | | Pack 6, Line 61 |
| Conveyor | CO-019 | Dorner, 6" x 3 ' | 75009282 | 835713-1-1-1 | Pack 6, Line 61 |
| Conveyor | CO-020 | Pacific Conveyor system 18"x 14'6 | Plastic Modular belt | | PACK 6, Line 62 |
| Conveyor | CO-021 | Dorner, 12" x 3' | 75009286 | 831886-3-1-1 | PACK 6, Line 62 |
| Conveyor | CO-022 | Kleenline 10" x14" | Plastic Modular belt | | Pack 6, Line 64 |
| Conveyor | CO-023 | Dorner 5' x 12" | 2200 Series / 75009306 | 750607-2-1-1 | Pack 6, Line 64 |
| Conveyor | CO-024 | Amazon | | | Pack 6, Line 64 |
| Conveyor | CO-025 | Amazon | | | Pack 6, Line 61/62 |
| Conveyor | CO-026 | Amazon | | | Pack 6, Line 63 |
| Conveyor | CO-027 | Dorner | M # 75009222 | S # 764568-1-1-1 | Pack 5, Line 52 |
| Conveyor | CO-28 | In House Built | | | Pack 6 , Line 63 |
| Conveyor | CO-29 | Dorner 6" x 15' | 22EDM06-150020d010103 | S# 8665389-7-1-2 | Pack 5 Line 53.5 |
| Conveyor | CO-30 | Dorner 6" x 15' | 22EDM06-150020d010103 | S#865389-7-1-1 | Pack 5, Line 53.5 |
| Conveyor | CO-31 | Dorner 8" x 5' | 22EDM08-060020D010103 | S#865389-1-1-1 | Pack 5 , Line 53.6 |
| Conveyor | CO-32 | Dorner 8" x 5' | 75009303 | S# 844932-3-1-2 | PACK 6, Line 62 |
| Conveyor | CO-33 | Dorner 6"x 5' | 75009298 | S# 866673-4-1-2 | Pack 7 ,Line 71-72 |
| Conveyor | CO-34 | Tyson | ASSET # 020-50014 | | PACK 7 , Line 73 |
| Conveyor | CO-35 | In House Built 6'3" x 1' | Plastic Modular Belt | | PACK 7 , Line 71-72 |
| Conveyor | CO-36 | In House Built 12" x 14' | Plastic Modular Belt | | Pack 2/4 , Line 21 |
| Conveyor | CO-37 | In House Built 26" x 16' | Plastic Modular Belt | | Pack 2/4 , Line 22 |
| Conveyor | CO-38 | Dorner 10" x 10' modified | | | Pack 6 , Line 64 |
| Conveyor | CO-39 | Dorner 8" x 6'3" modified | | | Pack 6, Line 64 |
| ADS | N/A | Marsh | 26278 | 203362004BL | |
| ADS | N/A | Marsh | 26278 | 203362002BL | |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Air Dryer | N/A | Gardner-Denver | RHT125 | 100000-3444257 | Pack 6 Compresser room |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Bread Hopper | N/A | N/A | N/A | N/A | N/A |
| Refrigeration Condenser | RE-CON-1 | Chandler/ Heatcraft | HDH1500D63 | T01K00358 | Room 1 |
| Refrigeration Condenser | RE-CON-2 | Heatcraft | BLV1500H2D | T00C00829 | Room 2 |
| Refrigeration Condenser | RE-CON-3 | Russell | VLD35H22-G | W04L27479603022 | Room 3 |
| Refrigeration Condenser | RE-CON-4 | Heatcraft | BBV2600H2D | ST06C00402 | Room 4 |
| Refrigeration Condenser | RE-CON-5-A | Chandler/ Heatcraft | HDH3500D64 | T00J01271 | Room 5 |
| Refrigeration Condenser | RE-CON-5-B | Bohn/ Heatcraft | BBV2600M6D | ST03H03697 | Room 5 |
| Refrigeration Condenser | RE-CON-6-A | Century | D S25H7 | 05-09-094216-010-002 | Room 6 |
| Refrigeration Condenser | RE-CON-6-B | Century | D S25H7 | 05-09-094216-010-001 | Room 6 |
| Refrigeration Condenser | RE-CON-7-A | Krack | KFDD050N4SGA | E19B00862807004001 | Room 7 |
| Refrigeration Condenser | RE-CON-7-B | Krack | CSD-0400-M4M-133DE A STST COM | | Room 7 |
| Refrigeration Condenser | RE-CON DC | Krack | CSD-0200-M4M-122DE A STST COM | | Room 7 (Decanting) |
| Freezer Condenser | FRE-CON-1-A | Heatcraft | ltdh0750h44 | TOOBO3667 | Freezer 1 |
| Freezer Condenser | FRE-CON-1-B | Heatcraft | LDT0900L6D | 86514401 | Freezer 1 |
| Freezer Condenser | FRE-CON-1-C | Trenton | T150L6-HT3A-BA | 92104206 | Freezer 1 |
| Freezer Condenser | FRE-CON-1-D | Trenton | T150L6-HT3A-BR | 72205589 | Freezer 1 |
| Freezer Condenser | FRE-CON-2 | Heatcraft | CDH3000L64 | T00B03552 | Freezer 2 |
| Freezer Condenser | FRE-CON-3 | Heatcraft | CDH3000L64 | T00C01286 | Freezer 3 |
| Freezer Condenser | FRE-CON-4 | KRACK | DLD0540L7M134CC | 531558-130-001 | Freezer 4 |
| Freezer Condenser | FRE-CON-5 | Kramer | KS22700L44 | J97 39024-012 | Freezer 5 |
| Freezer Condenser | FRE-CON-6 | Keeprite | KC2500LZ-HTYA-1070 | 2030916 | Freezer 7 |
| Freezer Condenser | Condencer 1 | Kramer | KS23000L57 | F9731063-016 | Building 4 |
| Freezer Condenser | Condencer 2 | Masterbuilt | BCXZ300XE | LP383560 | Building 4 |
| Freezer Condenser | Condencer 3 | Kramer | KS23000L57 | F9731063-012 | Building 4 |
| Freezer Condenser | Condencer 4 | Hussman | DLD0541L4M10 | 602958-010-001 | Building 4 |
| Bread Coolar | Bread- Con | Masterbuilt | BCM-35020 | 0N350940 | Building 2 |
| Freezer Evaporator | FRE-EV-1-A | KRACK | MK34E-246-Baa T ST ST ST | 855556-010-001 | Freezer 1 |
| Freezer Evaporator | FRE-EV-1-B | Hussman | MK36-309EDL-230 | 481840-06A | Freezer 1 |
| Freezer Evaporator | FRE-EV-1-C | Heatcraft | BML330CEA | T15Ho5369 | Freezer 1 |
| Freezer Evaporator | FRE-EV-1-D | Chandler | ????30AC33 | WW805089 | Freezer 1 |
| Freezer Evaporator | FRE-EV-1-E | Heatcraft | BML250CEA | T15HO5365 | Freezer 1 |
| Freezer Evaporator | FRE-EV-1-F | Heatcraft | BML225CEA | T15H05366 | Freezer 1 |
| Freezer Evaporator | FRE-EV-02 | Heatcraft | CHL1050DPA | D00B09626 | Freezer 2 |
| Freezer Evaporator | FRE-EV-03 | Climat Control | | | Freezer 3 |
| Freezer Evaporator | FRE-EV-4-A | Hussman | SM341393 EDL | | Freezer 4 |
| Freezer Evaporator | FRE-EV-4-B | Hussman | SM341393 EDL | | Freezer 4 |
| Freezer Evaporator | FRE-EV-5-A | Heatcraft | FL-5503H | D98E02091 | Freezer 5 |
| Freezer Evaporator | FRE-EV-5-B | Heatcraft | FL-5503H | D98E02090 | Freezer 5 |
| Freezer Evaporator | FRE-EV-6-1-A | BOHN | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-1-B | BOHN | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-2 | BOHN | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-3 | Centry | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-4-A | Climat Control | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-4-B | Climat Control | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-5-A | Climat Control | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-6-5-B | Climat Control | | | Freezer 6 |
| Freezer Evaporator | FRE-EV-7 | KeepRite | | | Freezer 7 |
| Freezer Evaporator | FRE-EV-7 | KeepRite | | | Freezer 7 |
| Freezer Evaporator | FRE-EV-7 | KeepRite | | | Freezer 7 |
| Freezer Evaporator | FRE-EV-C-2 | Chandler | ???30AC33 | WW805089 | Freezer 1 |
| Freezer Evaporator | FRE-EV-D-1 | Heatcraft | BML250CEA | T15H05365 | Freezer 1 |
| Freezer Evaporator | FRE-EV-D-2 | Heatcraft | BML250CEA | T15H05366 | Freezer 1 |
| Raw Room Condenser | RAW-CON 1 | Heatcraft | HDH1500D63 | T01OO357 | Raw Room |
| Raw Room Condenser | RAW-CON 2 | Kramer | LV-10S | E0041576-1301 | Raw Room |
| Raw Room Condenser | RAW-CON 3 | Tyler | EFA160MA | 0155480012 001 | Raw Room |
| Raw Room Condenser | RAW-CON 4 | Hussman | GAD-46-480-A | 476329-19B | Raw Room |
| Raw Room Condenser | RAW-CON 5 | Tyler | EFE340MD | 155480009001 A02 | Raw Room |
| Cooler Condenser | COO-CON-02 | Kramer | KS21000H44 | F0054770-0092 | Room 2 |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Cooler Condenser | COOL-CON | Masterbuilt | BCM-35020 | ON350940 | Building 4 |
| Cooler Condenser | COO-CON-03 | Heatcraft | CDH3000L64 | T00B03551 | Room 3 |
| Cooler Evaporator | COO-EV-1 | Russell | UAM2-390 | H0322009-0217 | Cooler 1 |
| Cooler Evaporator | COO-EV-2 | Russell | HHA1100BA | DO1JO8891 | Cooler 2 |
| Cooler Evaporator | COO-EV-3 | Climat Control | | | Coolar 3 |
| Cooler Evaporator | COO-EV-4 | Krack | | | Coolar 4 |
| Cooler Evaporator | COO-EV-4 | Krack | | | Coolar 4 |
| Evaporator | EV-1-A | Russell | UAM2-390 | H03222009-0204 | RM 1 |
| Evaporator | EV-1-B | Russell | UAM2-390 | H03222009-0209 | RM 1 |
| Evaporator | EV-2-A | Bohn | LO-2660C | D93E03513 | RM 2 |
| Evaporator | EV-2-B | Bohn | LO-2660C | D93E03514 | RM 2 |
| Evaporator | EV-2-C | Heatcraft | LFA2FOAE | T96K01756 | RM 2 |
| Evaporator | EV-2-D | Heatcraft | LFA27OAE | T96H01859 | RM 2 |
| Evaporator | EV-3-A | Century | A542-925E | 06-02-065570-002-001 | |
| Evaporator | EV-3 | BOHN | | | |
| Evaporator | EV-3-C | Century | A542-925E | 06-02-065580-002-004 | |
| Evaporator | EV-4-A | Heatcraft | HHA1170DPA | DOOJO8271 | RM 4 |
| Evaporator | EV-4-B | Heatcraft | HHA1170DPA | DOOJO7714 | RM 4 |
| Evaporator | EV-5-A-A | Chandler | | | Room 5 |
| Evaporator | EV-5-A-B | Chandler | | | Room 5 |
| Evaporator | EV-5-B-A | Bohn | BMA600MA | D96F 02840 | Room 5 |
| Evaporator | EV-5-B-B | Bohn | BMA600MA | D96F 00863 | Room 5 |
| Evaporator | EV-5-B-C | Bohn | | | Room 5 |
| Evaporator | EV-6-A-A | Ref Plus | LME08400-9-SP | D 2013100586 | Room 6 |
| Evaporator | EV-6-A-B | Ref Plus | LME08400-9-SP | D 2013100567 | Room 6 |
| Evaporator | EV-6-B-A | Ref Plus | LME08400-9-SP | D 2013100566 | Room 6 |
| Evaporator | EV-6-B-B | Ref Plus | LME08400-9-SP | D 2013100565 | Room 6 |
| Evaporator | EV-7 | Bohn | | | Room 7 |
| Evaporator | EV-7 | Larkin | | | Room 7 |
| Evaporator | EV-7 | Bohn | | | Room 7 |
| Evaporator | EV-7 | Bohn | | | Room 7 |
| Evaporator | Build 3 decant | Krack | | | Decanting Room |
| Evaporator | Build 3 decant | Krack | | | Decanting Room |
| Evaporator | Bread coolar | Krack | | | Bread Coolar |
| Evaporator | Bread coolar | Krack | | | Bread Coolar |
| Air Compressor | | Champion | HRA25-12 | D090267 | |
| Air Compressor | | Gardner Denver | CL15-223 | D178618 | Boiler Room |
| Air Compressor | | Gardner Denver | EJBRFB | M52735 | Boiler Room |
| Air Compressor | | Gardner Denver | D207758 | CL-15-22C | Boiler Room |
| Cardboard Vertical Bailer | N/A | McClain EPCO Inc. | E11 | NA-1535 | Room A |
| Cardboard Compacter | N/A | Marathon | V7230HD | 2219235 | Room A |
| Scissor Lift | N/A | JLG | 1932-L2.1 | 200082377 | Room A |
| Welder | N/A | Miller | 907596001 | MH030545L | Room A |
| Band Saw | N/A | MSC | 9518879 | 77104004 | Room A |

SCHEDULE 3
Purchased Equipment

| Description: | PM # | Brand: | Model: | Serial #: | Location: |
|---|---|---|---|---|---|
| Hand Brake | N/A | Birmingham | 48" | F13553 | |
| Lathe | N/A | South Bend | 16" Swing, 8' Length of Bed | 1175 | |
| Mill | N/A | Bridgeport | No info | J-65554 | |
| Bag Sealer | N/A | Bandrite | 6000-4240-000 | 3415AR | Hallway |
| Boiler | N/A | Cleaver Brooks | CB-700-30 | L-101199 | Boiler Room |
| 625 Gal. SS Jacketed Tank, open | N/A | No info | No info | No info | Boiler Room |
| Smoker | N/A | Enviro-Pak | CVU-2400G | 98J-6756-073 | Smoke House |
| Smoker | N/A | Southern Pride | XLR-1600-L1-SISE | 16-147 | Smoke House |
| Smoker | N/A | Enviro-Pak | CVU-6G | 17G-8449-218 | Smoke House |
| Smoker | N/A | Friedrich | No info | No info | Smoke House |
| Smoker | N/A | Southern Pride | XLR-1400-SLSE | 417 | Smoke House |
| Smoker | N/A | Southern Pride | XLR-1400-SLSE | 756 | Smoke House |
| Smoker | N/A | Southern Pride | SPK-1400 | K1401045 | Smoke House |
| Vacuum Sealer | N/A | ProMax Vac | SC-800B-LR | No info | |
| Pressure Washer | N/A | Hotsy | 1743 | 11065290-156859 | Wash Room |
| Lazy Susan - 35" | N/A | Garvey | 1546 | 9924 | |
| Turntable - Stainless Steel | N/A | CM Product Solutions | 44" Diameter | No info | |
| Lazy Susan / Turntable - 43" | N/A | CE | 17113 | 516/010107-USA | |
| Turntable - Stainless Steel | N/A | CM Product Solutions | 44" Diameter | No info | |
| Turntable - Stainless Steel | N/A | Cheetah Systems | 36" Diameter | No info | |
| Rollstock #1 | N/A | Rollstock | RI-200 | 1064320002 | Storage |
| Rollstock #2 | N/A | Rollstock | RI-200 | 102312015 | Storage |
| Rollstock #3 | N/A | Rollstock | Alliance | 97411008 | Storage |
| Rollstock #4 | N/A | Rollstock | RI-420 | 98412012 | Storage |

SCHEDULE 3
Purchased Equipment

V-Mag Elevator (Tote) Tabletop Belt 10ft Mild Steel
4ft Wire Belt 90 Degree Conveyor
Plus Machinery Inc. Ser #89-25-136, Mod #EFS-20 Tray Sealer Ness and Co. Type FR 1600/6
Smoke Generator
Rockford Midland Case Packer Model #806, Serial #11028 Dial Filler (Servo Drive) FEMC
Shaklin Bag Sealer Mod #S-3CL Stream Feeder St850
Wire Conveyor 3ft wide 5ft long
Vinyl Belt Conveyor l611x10ft Mild Steel Little David Label Applicator System Glazing
Conveyor 4ft wide 3ft long Reliance Varidrive Motor
Meat Shredder Tabletop Carrathers
Exhaust Fan Pennbarry H63876-011A DX16B Slicer (Chicken)
Lock Metal Detector
Wexxar Model 505C3XS-125055 Case Erector Bel 505-SS CRM Slicer Sexus S.S.
(2) Bosch 101Wrappers
(3) Smartstep 2 Footwear Sanitizing Unit (15)TotesforSauce
(2) Electrosteam Eagle Series Ser# 42969 + Ser# 42970, Mod #EAG-LG-040
(8) Barcode Scanners

SCHEDULE 4[1]
Permitted Liens

| Permitted Lien Holder | Agreement / Collateral |
|---|---|
| REF | Equipment Rental Agreement |
| Wells Fargo Equipment Finance | Lease Agreement 001 dated 12/27/23<br>Lease Agreement 002 dated 4/15/21<br>Lease Agreement 003 dated 4/27/21 |
| Leaf Capital Funding, LLC | Finance Agreement dated 2/23/21<br>Finance Agreement dated 3/18/21<br>Finance Agreement dated 7/23/21 |
| Byline Financial Group | Finance Lease Agreement No. 57549<br>Finance Lease Agreement No. 57729<br>Finance Lease Agreement No. 57730<br>Finance Lease Agreement No. 57732<br>Finance Lease Agreement No. 56045<br>Finance Lease Agreement No. 56139 |
| Meridian | Bun Saw & Detopper Conveyor |
| New Lane Finance | Equipment Finance Agreement #APP-000018852 |
| Xerox | One - New Xerox B8155H2 206589, One - New Xerox C8170H2 206590, One - New Xerox C8135T2 206591, One - New Xerox C8135T2 206592 |
| Premier | Master Lease Agreement No. 1601221 and all Lease Schedules executed thereunder |

---

[1] This Schedule 4 may be modified by Buyer between the date of the executed APA and the Closing Date.

SCHEDULE 5
Assumed Customer Co-Manufacturing Agreements

**Customer Co-Manufacturing Agreements:**[1]

| Customer | Agreement |
|---|---|
| Golden West Trading, Inc. | Contract Manufacturing Agreement dated 1/24/24 |
| Demers Food Group, Inc. | Contract Manufacturing Agreement dated 8/8/23 |

---

[1] This Schedule 5 may be modified by Buyer between the date of the executed APA and the Closing Date.